JALHMARH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PERRY MARGOULEFF,

                    Plaintiff,

              v.                              18 Civ. 7334 (RA)

JEFF BECK,
                                              Hearing

                    Defendant.

------------------------------x
                                              New York, N.Y.
                                              October 21, 2019
                                              10:15 a.m.

Before:

                    HON. RONNIE ABRAMS,

                                              District Judge

                              APPEARANCES

WITHERS BERGMAN LLP
        Attorneys for Plaintiff
BY:  DEAN NICYPER
        JOSEPH E. GALLO

BAUM LLC
        Attorneys for Defendant
BY:  DAVID R. BAUM

Also Present:  Lalindra Sanichar, Paralegal

JALHMARH

1              (Case called)

2              MR. NICYPER:  Dean Nicyper, Withers Bergman, counsel

3      for plaintiff, Perry Margouleff.

4              MR. GALLO:  Joe Gallo, Withers Bergman, also for

5      plaintiff.

6              THE COURT:  Good morning.

7              MR. GALLO:  Good morning, your Honor.

8              MR. BAUM:  Good morning, your Honor.  David Baum from

9      Baum LLC for the defendant Jeff Beck.

10             THE COURT:  Good morning to you as well.

11             So we all know why we're here.  This hearing is

12     designed to address whether Mr. Beck is subject to personal

13     jurisdiction based on the way that he was served.  I'm going to

14     let you take the lead in terms of the hearing today, and I'll

15     ask questions as need be, but if anyone wants to make an

16     opening statement, feel free to do so, but I'm obviously very

17     familiar with the case and with this particular motion.

18             MR. NICYPER:  We don't have an opening statement, your

19     Honor.  There is one issue.  It's somewhat evidentiary.  It's

20     one of the videos.  I mentioned this on the phone the other day

21     that we have a concern about it because it appears to have been

22     altered, and I don't know if your Honor would like to address

23     that now or later.  But we do have a concern about the video,

24     surveillance video, from inside the building where it has two

25     blips, and then there's a piece that's been cut out of it.

JALHMARH

1              THE COURT:  OK.  Do you want to address that,

2    Mr. Baum?

3              MR. BAUM:  Yes, your Honor.  The first we heard of

4    this was, I think, late last week.  It should not be an issue

5    for this hearing, your Honor, because there are three videos.

6    On direct testimony with Mr. Beck, I plan on showing two of the

7    videos, not the video that has now for the first time come into

8    some kind of dispute.  So it will not be admitted on direct

9    evidence anyway.  We may use the video in the cross-examination

10   of the process server.  So even if there was some objection to

11   it, it would be permissible anyway as cross-examination.

12             But, in any event, your Honor received a declaration

13   from Mr. Thomas Bailey attesting to these videos, I think,

14   maybe a year ago, and there's been no objection to it either in

15   the opposition papers to the motion to dismiss or at any time

16   in any correspondence or by phone or any other way in the past

17   year.  So we do believe that that video was submitted to

18   evidence on the motion, and it was indeed referenced in your

19   Honor's decision.  So I don't believe it's relevant or

20   necessary to address it as part of this traverse hearing, but

21   in any event, it's a piece of evidence that there was ample

22   opportunity to object to more than a year ago.

23             THE COURT:  Do you want to be heard?

24             MR. NICYPER:  Well, we did object a week ago in

25   preparation for this hearing, so we do have an objection to the

JALHMARH                          Beck - Direct

1    use of that video.

2              THE COURT:  All right.  I'm going to reserve ruling on

3    that.  You can utilize the video, and then after I hear the

4    witnesses' testimony about the circumstances and to the extent

5    that those witnesses have knowledge of what may or may not have

6    been in the video, I'll then consider your objection.

7              MR. NICYPER:  Thank you very much, your Honor.

8              THE COURT:  Who's going to be our first witness?

9              MR. BAUM:  May I walk to the --

10             THE COURT:  You may, of course.  I'm just going to

11   advise everyone to speak into the microphones, please.  It can

12   be difficult to hear.

13             MR. BAUM:  Yes, your Honor.  Again, this is David Baum

14   representing Mr. Jeff Beck.  The first witness we call is

15   Mr. Jeff Beck, who is on the video screen in England at the

16   moment.

17             THE COURT:  All right.  Good morning, Mr. Beck.

18             THE WITNESS:  Good morning.

19             THE COURT:  I'm going to have my deputy, Ms. Cavale,

20   swear you in, so I'm going to ask you to raise your right hand

21   please, sir.

22   GEOFFREY ARNOLD BECK,

23        called as a witness by the defendant,

24        having been duly sworn, testified as follows:

25             THE COURT:  You may proceed, Mr. Baum.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JALHMARH                          Beck - Direct

 1              MR. BAUM:  Thank you, your Honor.

 2    DIRECT EXAMINATION

 3    BY MR. BAUM:

 4    Q.  Mr. Beck, do you have a video screen from which you can see

 5    the courtroom?

 6    A.  Yes.

 7    Q.  Do you see the judge, Her Honor, on the right side of your

 8    video?

 9    A.  Yes, I do.

10    Q.  Do you see me waving my hand at you?

11    A.  Yeah.

12    Q.  OK.  Just wanted to make sure that the video was

13    understood.

14    A.  OK.

15    Q.  Can you please state your full name for the record.

16    A.  Geoffrey Arnold Beck.

17    Q.  What is your citizenship?

18    A.  English, UK.

19    Q.  Where do you live?

20    A.  I live in Sussex, UK.

21    Q.  Where is that?

22    A.  Southern England.

23    Q.  Do you own a residence there?

24    A.  Yes, I do.

25    Q.  Do you own a residence in New York?

JALHMARH                              Beck - Direct

1   A.  No.

2   Q.  Where are you located right now?

3   A.  I'm in London, video conference center.

4   Q.  Can you please tell us what your profession is.

5   A.  Musician.  Guitarist.

6   Q.  For how long have you been a musician?

7   A.  From the age of 15, 14.

8   Q.  As part of your profession as a musician, do you perform at

9   concerts?

10  A.  Yes, I do.

11  Q.  For how many years have you done so?

12  A.  Approximately 1960 was the first concert, proper concert.

13  Q.  So that's approximately almost 60 years?

14  A.  Yeah.

15  Q.  Sorry.  My math is quite horrible.  That sounds quite a

16  long time.

17          Do you recall that in July and August of 2018, you

18  played a few shows in the United States?

19  A.  Yes, I do.

20  Q.  Do you recall that on the evening of August 28, 2018, in

21  particular, you played a show at the Capitol Theatre in Port

22  Chester, New York?

23  A.  Yes.

24  Q.  Can you please tell the Court how you traveled to the venue

25  in Port Chester, New York, for that performance.

JALHMARH                         Beck - Direct

```
 1    A.  By tour bus.
 2    Q.  Where did the tour bus drive?
 3    A.  Where did it drive?
 4    Q.  Yes, from what location to what location?
 5    A.  I don't remember where.
 6    Q.  You arrived at the venue by tour bus, you say, yes?
 7    A.  Yes.
 8    Q.  Where did you get dressed for the performance?
 9    A.  Where did I?  Sorry.
10    Q.  Where did you get dressed?  Where did you prepare for the
11    performance?
12    A.  Oh, on the bus.  A lot of times I would get dressed on the
13    bus.
14    Q.  Did there come a time when you walked from the tour bus to
15    the venue?
16    A.  Yeah.
17    Q.  Can you tell us how you entered the venue.
18    A.  I walked to the venue from the bus.  It's a short walk.
19    Q.  Did anybody accompany you on the walk from the bus to the
20    venue?
21    A.  Yes, I had Chris Fenn with me.
22    Q.  Can you please tell us, who is Chris Fenn?
23    A.  He's my personal assistant.
24    Q.  Was there anything unusual about Mr. Fenn accompanying you
25    to the walk to the stage door?
```

JALHMARH                              Beck - Direct

1    A.  No, it was usual practice.

2    Q.  Was there anybody else together with you and Mr. Fenn on

3    the walk from the bus to the venue?

4    A.  Yes.  There was security, house security, not my personal

5    security.

6    Q.  How many individuals were there?

7    A.  I believe two.

8    Q.  And you said they were house security.  Just so we're

9    clear, do you hire those security guards?

10   A.  No.

11   Q.  Who employed them?

12   A.  The venue.

13   Q.  Was there any particular reason why they were employed on

14   this specific occasion?

15   A.  Not really.  I mean, sometimes they're there; sometimes

16   they're not.

17   Q.  Is it common for venues to provide security staffers?

18   A.  Yes.

19   Q.  Did you request them on this occasion?

20   A.  No.

21   Q.  Can you please tell us everything that you recall about the

22   walk from the tour bus to the stage door at the venue.

23   A.  Usually I'm pretty nervous before a show, and I'm thinking

24   about how it's going to go and just concentrating on the show.

25   Q.  Can you please tell us the physical events that transpired,

JALHMARH                          Beck - Direct

1   what it actually looked like, the walk from the bus to the

2   venue.

3   A.  Well, I was walking just in a normal fashion and getting

4   into the building as quickly as possible.

5   Q.  You say "in a normal fashion."  Was there anything that

6   evening that was outside of your normal routine at

7   performances?

8   A.  No.

9   Q.  Did anybody approach you when you exited the tour bus?

10  A.  No.

11  Q.  Sorry?

12  A.  No.

13  Q.  At any time during the walk from the tour bus to the stage

14  door, did you encounter anybody holding out papers?

15  A.  No.

16  Q.  At any time did you hear anybody announce to you that he or

17  she was a process server?

18  A.  No.

19  Q.  Did you hear anybody yelling out your name at all?

20  A.  No, I didn't.

21  Q.  Did you know whether anybody, other than Mr. Fenn and the

22  two security staffers, was following you on the walk from the

23  tour bus to the stage door?

24  A.  No.

25  Q.  Did anybody tell you that there was a process server

JALHMARH                        Beck - Direct

1    present at the venue?

2    A.   No.

3    Q.   Did anybody tell you that somebody was following you on the

4    walk?

5    A.   No.

6    Q.   Did you ever turn around to see for yourself whether

7    anybody was following you?

8    A.   No.

9    Q.   Do you recall when you passed through the stage door into

10   the venue?

11   A.   Yeah, I remember walking in.

12   Q.   When you walked in, did you see anybody tossing papers at

13   you?

14   A.   No, I did not.

15   Q.   Did you hear anybody calling out your name at that point?

16   A.   No.

17   Q.   Now, prior to the show that evening, were you aware that a

18   lawsuit had been filed against you in New York court?

19   A.   No.

20   Q.   Did you expect that somebody might show up at the venue

21   that evening with court papers from the lawsuit?

22   A.   No.

23   Q.   I believe you have a laptop present with you, and I would

24   like for whoever's there with you to play the first video that

25   is labeled "Stage Door 2 South."

JALHMARH                              Beck - Direct

 1              Your Honor, if you wish, I'm happy to identify the

 2     gentleman that's with Mr. Beck.

 3              THE COURT:  That's fine.  What's more important to me

 4     is I want to be able to see what Mr. Beck sees as well.

 5              MR. BAUM:  I was about to address that with you, your

 6     Honor.  We spoke with the tech adviser for the court.  I can

 7     play that video for you, but unfortunately, I believe it will

 8     at least temporarily disable you from seeing Mr. Beck.

 9              THE COURT:  OK.  Why don't you do this:  Just take a

10     break for one minute; play that video.  I know it's very short.

11     I've seen it before, but I want to be reminded as to which

12     video we're looking at, and then we'll go back to Mr. Beck's

13     testimony.

14              MR. BAUM:  Yes, your Honor.  Now, there are two short

15     videos.

16              I promise you, Dean, it's neither -- not the third one

17     to which you object.

18              Would you like me, your Honor, to play both videos to

19     save time and then go back to question or --

20              THE COURT:  Either way.  You can play one and ask him

21     questions about that one.  I think that's probably better.

22     Then play the other and go back to questions about that second

23     video.

24              MR. BAUM:  Yes, your Honor.

25              MR. NICYPER:  Yes, your Honor.  I would ask that the

JALHMARH                              Beck - Direct

1  person who's in the room with Mr. Beck be identified.

2           THE COURT:  Sure.

3           MR. BAUM:  My pleasure, your Honor.  That is Mr. Colin

4  Newman, and he is the manager in the UK.  I believe your Honor

5  has a declaration from him submitted on the motion to dismiss.

6           THE COURT:  All right.

7           MR. NICYPER:  I'm somewhat concerned that he is in the

8  room with Mr. Beck, but we'll address that later.

9           MR. BAUM:  Your Honor, the only reason he is there is

10  to handle the computer.

11          THE COURT:  Just to be clear, Mr. Newman, you're not

12  to speak to Mr. Beck about this matter at all.  You're just

13  going to play the videos, but you're not to talk about the

14  substance of the issues that we're discussing, please.

15          MR. BAUM:  Mr. Beck, I'm just going to step over to

16  the table to the right for a brief moment to play the video for

17  the Court, and we'll return.  In the interim -- well, we'll

18  have you play the video later.  Hold on.

19          Your Honor, is it on your screen?

20          THE COURT:  Yes.

21          MR. BAUM:  I'm going to hit "play."  This is the first

22  video, your Honor.

23          (Video played)

24          MR. BAUM:  I don't know how to get Mr. Beck back on

25  the screen.  I believe that may have just -- great.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JALHMARH                          Beck - Direct

 1              THE COURT:  Here we are.

 2              MR. BAUM:  Thank you.

 3  BY MR. BAUM:

 4  Q.  Mr. Beck, thank you for your patience.  If you don't mind,

 5  would you play on the computer the video marked "Stage Door 2

 6  South."

 7  A.  OK.

 8  Q.  I'm going to ask you to play it and watch the whole thing

 9  through --

10  A.  Yeah.

11  Q.  -- prior to asking you questions.

12              (Pause)

13  Q.  Is the video completed?

14  A.  Yeah.

15  Q.  In that video that you saw, can you please identify for the

16  Court who is walking with you.

17  A.  That's Chris Fenn.

18  Q.  Can you describe his outfit?

19  A.  I can't remember what he wore.

20  Q.  Who were the two other individuals walking together with

21  Mr. Fenn?

22  A.  They'll be the house security.

23  Q.  Do you see on the video that there was a woman with a white

24  top who was behind the group of you as you were walking on the

25  street?

JALHMARH                          Beck - Direct

1    A.  Yeah, I saw her.

2    Q.  Do you recall seeing her that evening on August 28, 2018?

3    A.  No.

4    Q.  OK.  I'd like now to play for the Court the second video,

5    and we'll go through this routine again where we'll show the

6    judge the video and we'll return to you.

7              THE COURT:  Thank you.

8              THE WITNESS:  OK.

9              MR. BAUM:  Your Honor, is that on your screen?

10             THE COURT:  Not yet.  Yes.

11             (Video played)

12             MR. BAUM:  If you could put Mr. Beck back on.

13             THE COURT:  Yes.

14             MR. BAUM:  Thank you.

15   BY MR. BAUM:

16   Q.  Mr. Beck, the courtroom has been shown the second video.

17   I'd like you to now watch the second video.  As you watch it,

18   if you'd please pay attention to the outfits of the people so

19   you can describe for the Court who they are.

20             Mr. Newman, would you hand him and play the second

21   video marked "Stage Door North."

22             Is that playing?

23   A.  Yes, it's one of the security guards.

24   Q.  Is the full video playing for you, sir?

25   A.  Yes.

JALHMARH                        Beck - Direct

1   Q.  Sorry.

2   A.  Yeah, that's me followed by Chris Fenn and the -- and

3   another security guard.

4           Video's stopped.

5   Q.  OK.  Thank you.

6           I'd like now to ask you a different question.  Do you

7   have before you on the table a declaration signed by

8   Mr. Christian Fenn?

9   A.  Let me see.  Yes, I have it now.

10  Q.  Have you ever seen that document before?

11  A.  Yes.

12  Q.  When was the first time you saw it?

13  A.  Hmm, I can't recall.

14  Q.  What, if anything, is your opinion about what Mr. Fenn

15  says?

16  A.  It's pretty much what happened.

17  Q.  Do you have in front of you also a declaration that you

18  signed?

19  A.  No, I don't, but I can get it.  Is it in here?

20          MR. NEWMAN:  Here you go.

21  A.  Oh, yeah.

22  Q.  Is that your signature on the last page of the document?

23  A.  Yes, it is.  Let me just -- yeah, that's mine.

24  Q.  Does this document reflect your own personal knowledge of

25  the events of that evening?

JALHMARH                          Beck - Cross

1    A.  Yes.

2    Q.  Now, in a letter to the Court, the counsel for the

3    plaintiff noted that your declaration is very similar to the

4    declaration by Mr. Fenn.  Do you have any opinion on why your

5    declaration might be similar or not similar to Mr. Fenn's?

6    A.  Oh, it's because it was an accurate statement of what

7    happened.

8              MR. BAUM:  OK.  Thank you, Mr. Beck.

9              I'm done with my examination, subject to any redirect.

10             THE COURT:  All right.  Any cross-examination?

11             MR. NICYPER:  Yes, your Honor.

12   CROSS-EXAMINATION

13   BY MR. NICYPER:

14   Q.  Hello, Mr. Beck.  My name is Dean Nicyper.  I am counsel

15   for Perry Margouleff in this case.  Can you hear me?

16   A.  Yes, I can.

17   Q.  I would like you to -- do you have a copy of the complaint

18   with you?

19   A.  Yeah, I do.

20   Q.  You've seen that complaint prior to today, is that correct?

21   A.  Yeah.

22   Q.  And you resisted being served with a summons and complaint

23   in this case, is that correct?

24             MR. BAUM:  Objection, your Honor.  That's a legal

25   question.

JALHMARH                          Beck - Cross

```
 1              THE COURT:  Sustained.

 2              Why don't you rephrase that, please.

 3   Q.  You avoided -- when process servers came to you to serve

 4   the summons and complaint, you avoided taking the summons and

 5   complaint, correct?

 6   A.  No, no.

 7   Q.  OK.  Let me break that down, please.

 8              In the declaration you signed that you have before

 9   you, you state that you live at ███████████████████

10   ██████, England, is that correct?

11   A.  ███████████.  It's plural.

12   Q.  That is your home?

13   A.  Yeah.

14   Q.  And someone came to serve the summons and complaint on you

15   at your home at that address in England on two separate days in

16   September of 2018, is that correct?

17   A.  No.

18              MR. BAUM:  Your Honor, we'd object.  The service or

19   attempted service in England is not a subject of this traverse

20   hearing at all.

21              MR. NICYPER:  Your Honor?

22              THE COURT:  Yes, go ahead.

23              MR. NICYPER:  This goes to the fact that he has

24   resisted service.  He did resist service in England, and he

25   resisted service in the U.S.
```

JALHMARH                          Beck - Cross

1          THE COURT:  I'll hear his testimony.  I will redact

2   his address from the court transcript, but I will hear his

3   testimony.

4          Please proceed.

5          MR. NICYPER:  Thank you.

6   BY MR. NICYPER:

7   Q.  Do you recall that someone came to serve the summons and

8   complaint at your home on two separate days?

9   A.  No.

10  Q.  Do you recall speaking with your wife about someone coming

11  to serve the summons and complaint on your home?

12  A.  No.

13         MR. NICYPER:  Your Honor, I'm concerned that the

14  witness keeps looking at Mr. Newman.

15         THE WITNESS:  No, I don't.

16         MR. NICYPER:  I am concerned about the testimony here.

17         THE COURT:  As I said, Mr. Newman, you're not to speak

18  to Mr. Beck at all.

19         Mr. Beck, you're not to speak to Mr. Newman or to look

20  at him.

21         But I don't have reason to believe that he did look to

22  Mr. Newman for any answers, so why don't you proceed.

23  BY MR. NICYPER:

24  Q.  Mr. Beck, do you recall that your wife, Sandra, told the

25  process server when he came to your home that you had been

JALHMARH                          Beck - Cross

 1  advised by your solicitors not to accept service of the U.S.

 2  court proceedings?  Do you recall that?

 3  A.  No, I don't recall that.

 4  Q.  You don't recall ever saying that to your wife?

 5  A.  No, I don't.

 6  Q.  And you don't recall your wife telling you that that, in

 7  fact, had occurred?

 8  A.  No, I don't recall it.

 9  Q.  You've seen that also in the videos there was a woman

10  behind you at the concert venue at the Capitol Theatre in Port

11  Chester, New York, on August 15.  Do you recall seeing her on

12  the video?

13  A.  I saw her on the video, yeah.

14  Q.  And that concert was on August 15, 2018, correct?

15  A.  Apparently so, yes.

16  Q.  Prior to that concert, you had already engaged in

17  communications in which you and the plaintiff, Perry

18  Margouleff, disputed which of you owned the Les Paul Burst

19  guitar which is at issue in this lawsuit, correct?

20  A.  I don't know what to say about that.  It was never any

21  dispute about who owned the guitar.

22  Q.  There was never a dispute?

23  A.  Not --

24  Q.  Mr. Newman is there with you, isn't he, today?

25  A.  Yes, he is.

JALHMARH                        Beck - Cross

1    Q.  Mr. Newman submitted a declaration in this lawsuit.  We

2    asked Mr. Baum to provide a copy.  Do you have that with you

3    today?

4    A.  Yeah.  Yes, I do.

5    Q.  If you could pull that out, please.  You will see that

6    attached to Mr. Newman's declaration is an email chain

7    containing a series of emails with Mr. Margouleff.

8    A.  Yeah.

9    Q.  Do you see those emails on Exhibit A to that declaration?

10   A.  I'm confused at what we're looking at.

11   Q.  Would you please pull out the declaration of Colin Newman.

12   Do you have that in front of you now?

13   A.  Yeah, I've got it.

14   Q.  OK.  You see it says, "Declaration of Colin Newman"?

15   A.  Yeah.

16   Q.  And you'll see there's text for two pages, and then on the

17   third page is an Exhibit A.

18          Your Honor, if you'd like, I can hand one up to the

19   Court.

20          THE COURT:  That would be great.  Thanks.  That's the

21   one thing I don't have in front of me.  Thank you.

22   BY MR. NICYPER:

23   Q.  Mr. Beck, I'd ask you to look at Exhibit A.  Do you see

24   that is an email chain; the top email is an email dated

25   February 3, 2018?

JALHMARH                              Beck - Cross

1    A.  OK.

2    Q.  You see that?

3    A.  OK.

4    Q.  Do you see the email at the top there, it says from Colin

5    to Pie Studios, and it's dated February 3, 2018?

6    A.  Yeah.

7    Q.  OK.  In that, toward the bottom of that video -- I'm sorry,

8    at the bottom of that email, is an email that is purported to

9    be from you.  Do you see that?  It says, "Hi Colin."

10   A.  Yeah.

11   Q.  Then it looks like it's signed "J."  Do you see that?

12   A.  Says, "He is completely avoiding the only issue.  It's my

13   guitar."

14   Q.  So you're aware of this email chain -- I'm sorry.  In that

15   email there that you just read from, that's an email you sent

16   in or around February 2018, correct?

17   A.  Yeah.

18   Q.  So you were aware of this email chain at that time,

19   correct?

20   A.  I knew there was some correspondence.  I didn't know to

21   what extent.

22   Q.  So if you would please turn the page, and in fact turn two

23   pages to the last page of this exhibit, there are a series of

24   emails on that last page.  Do you see those?  The first one

25   being at the bottom of the page from Colin Newman to Pie

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JALHMARH                              Beck - Cross

1  Studios dated January 11, 2018.  Do you see that?

2  A.  "I manage Jeff Beck"?

3  Q.  Yes, that's the one.

4  A.  OK.

5  Q.  In that email, Mr. Newman states that you were "quite

6  anxious to try to seek return of the guitar."  Do you see that?

7  A.  Yeah.

8  Q.  So you were aware of this email chain with Mr. Margouleff

9  in which the two of you were disputing the proper rightful

10  owner of the guitar, correct?

11  A.  Yeah.

12  Q.  And that was in January, February 2018, correct?

13  A.  Yeah.

14  Q.  And you had previously met Mr. Perry Margouleff, so you

15  were familiar with the person with whom these emails were

16  exchanged, is that correct?

17  A.  I was familiar with him.  I knew his name and I had -- I

18  was aware of him.

19  Q.  You'd, in fact, done some recording sessions with him,

20  correct?

21  A.  No, absolutely not.

22  Q.  OK.  You don't recall a recording session with Mick Jagger

23  where he was present?

24  A.  No.

25  Q.  OK.  The emails we just looked at were just months prior to

JALHMARH                          Beck - Cross

1    your playing at the Capitol Theatre in Port Chester on

2    August 15, 2018, correct?

3    A.   Yes.

4    Q.   And on August 15, you performed at that concert at the

5    Capitol Theatre, is that correct?

6    A.   That's correct.

7    Q.   Before the concert began, you arrived at the Capitol

8    Theatre on a musician's tour bus, correct?

9    A.   Correct.

10   Q.   And that tour bus, that's a large bus, correct?  It's about

11   the size of a commercial passenger bus, is that correct?

12   A.   It's the standard bus size for tours.

13   Q.   But it's a large such -- I don't know if you're familiar

14   with a Greyhound bus.  It's a large bus, correct?

15   A.   Yeah.

16   Q.   And that bus was parked on a side street next to the

17   Capitol Theatre, is that correct?

18   A.   Yes.

19   Q.   In fact, your band had two tour buses that night, correct?

20   A.   Yeah.  That would be crew bus, I guess.

21   Q.   So there was one bus that you came on?

22   A.   Yeah.

23   Q.   And then a second bus that you say the crew came on?

24   A.   Yes.

25   Q.   And those were both two large buses, is that correct?

JALHMARH                          Beck - Cross

1    A.  Yeah.

2    Q.  Your bus was parked in the front, is that correct?

3    A.  I believe so.

4    Q.  Then the other large bus was parked directly behind your

5    bus, correct?

6    A.  I guess so, yeah.

7    Q.  Then, as we saw in the video, there was an additional large

8    truck that carried your equipment, correct?

9    A.  Yeah.

10   Q.  That large truck was parked behind the two tour buses,

11   correct?

12   A.  Yeah.

13   Q.  I'm sorry.  I didn't hear the answer.

14   A.  Yes.

15   Q.  So those three vehicles were parked in a row on that side

16   street, is that correct?

17   A.  Yeah.

18   Q.  And the bus you were in was in the front, the bus -- there

19   was a bus behind that, and then the tractor-trailer, correct?

20   A.  Yes.  I've already said that.

21   Q.  So to walk to the stage door, you had to walk the full

22   length of the bus you were on plus the full length of the bus

23   your crew members were on plus the full length of the

24   tractor-trailer truck, correct?

25   A.  Yeah, absolutely, yeah.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JALHMARH                          Beck - Cross

1   Q.  Now, you were asked to look at the declaration you signed
2   in this case.  Did you draft that declaration yourself?
3   A.  No, I didn't.
4   Q.  Who drafted that?
5   A.  That was David Baum.
6   Q.  Did you review it before you signed it?
7   A.  Yeah.
8   Q.  You say in that declaration, if you'd look, please -- your
9   Honor, do you have a copy of that?
10          THE COURT:  I do have a copy of that.  Thank you.
11  Q.  OK.  You say in that declaration, paragraph 3, that you
12  spent the entire afternoon and evening prior to the show on the
13  tour bus.  Do you see that?
14  A.  Yeah.
15  Q.  Did you do a sound check earlier in the day inside the
16  concert venue?
17  A.  Yes, we usually do.  I can't recall it, but we usually --
18  we may well have done a sound check.  I'm pretty sure we would
19  have done a sound check.
20  Q.  So you didn't spend the entire afternoon on the bus,
21  correct?
22  A.  Well, that was my home, the bus, so --
23  Q.  In fact, you had gone in and out of the bus that afternoon,
24  correct?
25  A.  Let me see.  I'm trying to recall.  Yeah, I could have.  I

JALHMARH                          Beck - Cross

1   could have left the bus a couple of times.

2   Q.   So the statement that you spent the entire day and the

3   evening in the bus in your declaration is not accurate,

4   correct?

5   A.   If you're talking about my location and my place on tour is

6   the bus.  So I -- you know, what else can I say?  If I went to

7   the sound check, I went to the sound check.

8   Q.   Did your band enter the concert venue at the same time you

9   did?

10  A.   They usually go ahead.

11  Q.   Did someone come to tell you when it was time to go into

12  the concert venue?

13  A.   Yes.

14  Q.   Who was that?

15  A.   That would be Chris, Chris Fenn.

16  Q.   And Chris Fenn was your tour manager on that tour, is that

17  correct?

18  A.   Yes.

19  Q.   And as your tour manager, what are the responsibilities of

20  a tour manager?

21  A.   It's too much to mention.  He does -- he coordinates the

22  tour.  He takes care of planning hotels, pastries at breakfast

23  time.  Anything, you name it, that is in line with what's

24  needed on the road.  He makes the checks, you know, phone call

25  checks, almost all day.

JALHMARH                          Beck - Cross

1    Q.  OK.  Is it fair to say on a tour he acts on your behalf to

2    address any issues that arise on the tour, is that correct?

3    A.  Yeah, logically speaking, yes.

4    Q.  Did you carry any of your guitars into the venue when you

5    went in?

6    A.  No.

7    Q.  Where were your guitars?

8    A.  Guitars were already on -- on the stage or in the dressing

9    room.

10   Q.  Now, you previously testified and I think you stated also

11   in your declaration that you were escorted by security staff

12   and Mr. Fenn going into the stage door from your bus.  Is that

13   correct?

14   A.  Yes, as per the video.

15   Q.  And you state that they walked with you, and I'm now -- if

16   you could look at your declaration, I'm talking about

17   paragraph 4 of your declaration.  You state that one security

18   staffer walked in front of you, correct?

19   A.  Yeah.

20   Q.  And as you walked, did you see him walking in front of you?

21   A.  Yes.

22   Q.  Also in paragraph 4 you state that the other security

23   staffer walked behind you, correct?

24   A.  Yes.

25   Q.  And at the time, how did you know he was walking behind

JALHMARH                              Beck - Cross

1   you?

2   A.  I don't know.  I can't answer that.

3   Q.  Did you see him walking behind you?

4   A.  No.  I was focused on walking in front -- putting one foot

5   in front of the other.

6   Q.  Did you turn around to look at him at some point?

7   A.  At no point.

8   Q.  You never turned around that entire walk?

9   A.  You can see on the video I didn't.

10  Q.  Well, we can see -- we'll get to that because to get to the

11  stage door, you and the four other people -- three other people

12  with you had to walk past the length of your tour bus, the

13  length of the second tour bus, the length of the

14  tractor-trailer truck used for equipment, and then another 20

15  or 30 feet to the stage door, correct?

16  A.  I don't have a tape measure.  I didn't have a tape measure,

17  but yes.

18  Q.  OK.  And those three vehicles, each of them is about three

19  or four meters in height, correct?

20  A.  I wouldn't know.

21  Q.  They're quite tall, is that correct?

22  A.  Yeah, size of --

23  Q.  And on the left side of the sidewalk that you were walking

24  down, there were brick buildings, is that correct?

25  A.  I don't know what they were made of.  Yeah, I was aware of

JALHMARH                                Beck - Cross

 1   the building.

 2   Q.  So they're brick buildings on your left side; there are the

 3   three vehicles on your right side as you walk down the sidewalk

 4   to the venue, correct?

 5   A.  Yeah.

 6   Q.  It was almost like walking down a sound tunnel, correct?

 7   A.  It's just normal procedure for me.

 8   Q.  And in any sound of someone yelling from right behind you

 9   would have been reflected off those walls on both sides of you,

10   correct?

11              MR. BAUM:  Objection, your Honor.

12              THE COURT:  Sustained.

13   A.  Yeah.

14   Q.  Were you wearing headphones as you walked down the street?

15   A.  No, I wasn't.

16   Q.  So at no time between when you left the tour bus to when

17   you entered the stage door were you wearing headphones,

18   correct?

19   A.  No.

20   Q.  There were no fans on the sidewalk while you walked from

21   the tour bus to the stage door, correct?

22   A.  No.

23   Q.  There were no autograph seekers on the sidewalk while you

24   walked from the tour bus to the stage door, correct?

25   A.  No, not as I recall, no.

JALHMARH                              Beck - Cross

1    Q.  When you first stepped outside the bus onto the sidewalk, a

2    woman approached you in a white shirt calling out she was there

3    to serve a summons and complaint on you, correct?

4    A.  No.

5    Q.  You didn't see her?

6    A.  That didn't happen.

7    Q.  So is it your position that there was no one else on the

8    street other than you, Mr. Fenn, and the two security guards?

9    A.  No, I was walking straight from the bus, as I always do,

10   with my mindset on the show, that's it.

11   Q.  The street next to the sidewalk that you were walking on

12   was only one lane in each direction, correct?

13   A.  Yeah, I guess so.

14   Q.  Did you hear any street sounds on the street as you walked?

15   A.  Lots of noise.  I think the buses' engines were runs

16   because of the fridges and stuff like that.  It's always pretty

17   noisy.

18   Q.  You say it was noisy.  When you say bus engines, the bus

19   engine is at the end of the bus, correct?

20   A.  The back end of the buses, yeah, and they would have both

21   been running, I would imagine.

22   Q.  Do you remember whether they were running?

23   A.  I know my bus was because they never shut it off.  There's

24   always a noise from the generator.

25   Q.  Did you hear the noise as you walked down the street?

JALHMARH                          Beck - Cross

1    A.  Yeah.

2    Q.  So you could hear noise as you were walking down the

3    street?

4    A.  I could hear the noisy street, yeah.

5    Q.  You could hear the sounds?

6    A.  I could hear the sounds of the engines.

7    Q.  And the bus engine was at the end of each bus.  So there's

8    a long distance of the bus and then an engine at the end?

9    A.  Yeah.  It was quite noisy, as I recall.

10   Q.  Do you remember hearing noise as you walked down the

11   street?

12   A.  I didn't focus on it.  I was focused on the show.

13   Q.  But you were aware of it?

14   A.  Yeah.

15   Q.  So you could hear noise as you walked down the street?

16   A.  I'm used to noisy buses, that's what I do.  I'm always

17   getting on and off noisy buses.

18   Q.  Let's look at the video.  You've seen the video.  I'd like

19   to look at the one with you walking down the street.

20            Lalindra, can I ask you to play that video, please.

21            Mr. Beck, I'm going to play that entire video, and

22   then we'll play it again and have some questions.

23            (Video played)

24   BY MR. NICYPER:

25   Q.  OK.  We've just seen that video here.  Mr. Beck, could you

JALHMARH                          Beck - Cross

1   get that video on the screen in front of you, please.

2   A.   Sure.

3            MR. NICYPER:  Can we get him back on the screen?

4   Q.   Do you have that video screen in front of you?

5   A.   Not yet.  Sorry.

6            MR. NICYPER:  Mr. Newman, when you get that video up,

7   could you please freeze frame it at -- you'll see there's

8   seconds on the bottom of it -- at second 25.

9            Could you freeze frame ours?  Why don't you pull ours

10  up and freeze frame it at second 25, please.

11           OK.  Your Honor, I have it in front of us, we have it

12  freeze framed at second 25.

13  Q.   Mr. Beck, is your screen also freeze framed at second 25?

14  A.   Yeah.

15  Q.   OK.  So if you --

16  A.   OK.

17  Q.   If you see in that freeze frame, the truck parked on the

18  street is your equipment struck, correct?

19  A.   Yes, I think so.

20  Q.   Before you reached the equipment truck, you had already

21  walked past your two tour buses, is that correct?

22  A.   I must have done.

23  Q.   I'm sorry.  The answer's yes?

24  A.   I had to have.

25  Q.   Yeah.  OK.  So this video is only showing a portion of your

JALHMARH                           Beck - Cross

1   walk from your tour bus to the stage door, correct?

2   A.  Yeah.

3   Q.  In fact, you had already walked past two long buses before

4   you were coming into view on this video, correct?

5   A.  Yeah.

6   Q.  You'll see walking behind you and the security guard is a

7   woman wearing a white shirt.  Do you see her there?

8   A.  Yeah, it's not that clear, but I see someone there, yeah.

9   Q.  I'll refer to her by name as Linda, Ms. Linda Benedetto.

10          In the video, actually, if we can -- I think it makes

11  sense to bring the video forward.

12          MR. SANICHAR:  And play it?

13          MR. NICYPER:  I'm sorry.  Could you play the video.

14          (Video played)

15  A.  OK.  It's playing now.

16  Q.  Freeze frame, please, right at No. 35.

17  A.  34, 35?

18  Q.  OK.  At 36, if you see 36, do you see she's carrying papers

19  in her hand?

20  A.  No, just shows her holding a bag, her left hand.

21  Q.  Can you go forward, frame 36, please.

22  A.  This is -- this is 36.  I can see it now, just gone past.

23  Q.  And you see she's holding papers in her hand.  Do you see

24  that?

25  A.  Yeah, I can see now.

JALHMARH                              Beck - Cross

1    Q.  And she was yelling to her -- yelling to you, telling you

2    that she was a process server serving those papers and

3    referring to them as the summons and complaint, correct?

4    A.  No.

5    Q.  You did hear her yelling, correct?

6    A.  No, I did not hear yelling.

7    Q.  If we could both go back to -- in fact, the video shows

8    that she was yelling so loudly one of the guards turned around.

9            If you could go back to frame 31, please.  OK.  If you

10   could stop it at 31, please.

11   A.  Hang on.  Sorry.

12   Q.  That's OK.  Take your time.

13   A.  Just gone past it.  It's difficult to -- 31, gone past it.

14   Q.  Do you have 31 on the screen?

15   A.  It's just coming up.  OK.

16   Q.  In that video, we see you walking.  Looks like you have a

17   white shirt and a vest on, correct?

18   A.  Yeah.

19   Q.  Behind you, that is Mr. Fenn, is that correct?

20   A.  Yeah.

21   Q.  And then behind him is a security guard.  Do you see that?

22   A.  I can't tell from that picture.

23   Q.  OK.  Then behind the security guard is Ms. Benedetto.  Do

24   you see her there?

25   A.  Yeah.

JALHMARH                              Beck - Cross

1  Q.  You can see the security guard's head is turned sideways.

2  Do you see that?

3  A.  No, not really.  This isn't a very clear image.

4       MR. BAUM:  OK.  You can take that video down.  Let's

5  go back to the screen.

6  Q.  Mr. Beck, your tour manager, Mr. Christian Fenn, signed a

7  declaration in this case.  Could you please get a copy of that

8  in front of you.

9  A.  Where's Chris'?

10       Got it.

11  Q.  OK.  Please look at paragraph 9 of his declaration.

12  A.  OK.

13  Q.  In paragraph 9 he states that he stayed inside the concert

14  venue to watch approximately ten minutes of the show, and he

15  further states that at approximately 8:30 p.m. he returned to

16  the bus.  At that time the driver handed me a set of documents

17  that was apparently left somewhere.

18       Do you see that?

19  A.  Yeah.

20  Q.  Mr. Fenn was your tour manager, correct?

21  A.  Yeah.

22  Q.  And you previously testified today that he was your tour

23  manager and acted on your behalf to address various issues that

24  arose on the tour, correct?

25  A.  Correct, yeah.

JALHMARH                          Beck - Redirect

1  Q.  So after the bus driver handed the summons and complaint to

2  Mr. Fenn, Mr. Fenn was holding it.  When you came out of the

3  concert venue, did Mr. Fenn give you a copy of that summons and

4  complaint at that time?

5  A.  No, he didn't.

6  Q.  If you had been served a summons and complaint that day or

7  if somebody had left it there, isn't that something you would

8  have wanted to see?

9  A.  Yeah, I suppose so, yeah.

10  Q.  But you're saying at no time did someone give you that

11  summons and complaint that day?

12  A.  No, they didn't, no.

13          MR. NICYPER:  All right.  I have no further questions,

14  your Honor.

15          THE COURT:  All right.  Any redirect?

16          MR. BAUM:  Yes, your Honor.

17  REDIRECT EXAMINATION

18  BY MR. BAUM:

19  Q.  Mr. Beck, I only have a few, maybe only one or two,

20  questions to ask you.

21          Do you recall that the attorney just now at the start

22  of your testimony was referring you to the declaration that was

23  signed by Mr. Colin Newman?

24  A.  Yeah.

25  Q.  Do you recall that he was pointing your attention to an

JALHMARH                            Beck - Redirect

1   email that Mr. Newman wrote on February 3, 2018?

2   A.  Yeah.

3   Q.  The show at Capitol Theatre was on August 28, 2018,

4   correct?

5   A.  Yeah.

6           MR. NICYPER:  Objection.

7           THE COURT:  What's the objection based on?

8           MR. NICYPER:  I think it's the wrong date.

9           MR. BAUM:  I'm sorry.  Is it October 28?

10          MR. NICYPER:  October 15.  I think you said October --

11  I'm sorry.

12          MR. BAUM:  I meant to say August.

13          MR. NICYPER:  August 18, but --

14          MR. BAUM:  My apologies.  I have my attention focused

15  on today.

16  BY MR. BAUM:

17  Q.  Mr. Beck, just to clarify, the show was on August 28, 2018,

18  correct?

19          Do I still have the date wrong?

20          MR. GALLO:  I think it's August 15.

21          MR. BAUM:  I'm sorry.

22  Q.  Either way, August 15, 2018, is the date of the show,

23  correct?

24  A.  Yeah.

25  Q.  Sorry.  So that's -- quick math -- so there was six months

JALHMARH                          Beck - Recross

1   in between the date of the email and the date of the show, is

2   that correct?

3   A.  Yeah.

4   Q.  At any time during those six months, did anyone ever alert

5   you that there might be a lawsuit filed against you?

6   A.  No.

7   Q.  Did anyone alert you that there might be papers that might

8   be tried to serve on you?

9   A.  No.

10          MR. BAUM:  OK.  Thank you.

11   RECROSS EXAMINATION

12   BY MR. NICYPER:

13   Q.  Just a very minor question.  Mr. Beck, you were aware,

14   between those emails in February and August, that there was

15   ongoing discussions about a dispute between you and Perry

16   Margouleff regarding who owned the guitar, correct?

17   A.  Yeah.

18   Q.  In fact, you hired Mr. Baum to get involved in that

19   dispute, is that correct?

20   A.  Correct.

21          MR. NICYPER:  OK.  Thank you.

22          No further questions.

23          THE COURT:  Mr. Beck, I'm just going to follow up with

24   one question, and I think you were essentially asked this

25   earlier.  But that day as you were walking to the venue, did

JALHMARH                         Benedetto - Direct

1    you hear anyone calling your name?

2              THE WITNESS:  No, I did not.  I didn't hear anything.

3              THE COURT:  All right.

4              THE WITNESS:  Other than the noise of the street.

5              THE COURT:  All right.  That's it for me.  Are we done

6    with Mr. Beck?

7              MR. BAUM:  Yes, your Honor.

8              THE COURT:  All right.  Thank you very much.

9              (Witness excused)

10             MR. BAUM:  Your Honor, we understand that the process

11   server will be called, so we'll permit direct testimony to be

12   given by her prior to my cross-examination.

13             THE COURT:  Yes, of course.

14             MR. GALLO:  Thank you, your Honor.

15             MR. NICYPER:  Your Honor, we would like to call

16   Ms. Linda Benedetto to the stand.

17             THE DEPUTY CLERK:  You're actually going to come over

18   here to this side.

19             MR. NICYPER:  Mr. Gallo is actually going to question

20   the witness.

21             THE COURT:  Good morning.

22   LINDA BENEDETTO,

23       called as a witness by the plaintiff,

24       having been duly sworn, testified as follows:

25             MR. GALLO:  May I proceed?

JALHMARH                          Benedetto - Direct

```
 1                    THE COURT:  You may.

 2                    MR. GALLO:  Thank you.

 3    DIRECT EXAMINATION

 4    BY MR. GALLO:

 5    Q.  Hello, Ms. Benedetto.

 6    A.  Hello.

 7    Q.  Are you currently working?

 8    A.  No, I'm retired right now.

 9    Q.  When did you retire?

10    A.  I retired sometime in the middle of 2019.  Somewhere around

11    November, somewhere around there.

12    Q.  What were you doing before you retired?

13    A.  I was an independent process server working for Action

14    Subpoena.

15    Q.  Approximately how many years before you retired were you a

16    process server?

17    A.  Twenty-five to 30 years.

18    Q.  Did you work with any other companies?

19    A.  Yes, I did.

20    Q.  I'm sorry.  Please wait for me for the court reporter.

21           Did you work with any other companies besides Action

22    Subpoena as a process server?

23    A.  Yes.

24    Q.  Can you remember what those companies were?

25    A.  Yes.
```

JALHMARH                          Benedetto - Direct

1    Q.   Would you mind stating them for the Court.

2    A.   Brockway Process Serving, Sav-On Process Serving, and

3    Action Subpoena.

4    Q.   Did you have any other jobs before becoming a process

5    server?

6    A.   I was a former -- working for a judge in Mount Vernon, New

7    York, that was retired.  I was doing estate work with him.

8    Q.   In the course of your career, can you recall approximately

9    how many subpoenas you've served in the state of New York?

10   A.   About over a thousand.

11   Q.   I apologize.  Can you recall how many court documents --

12   subpoenas, process, not just subpoenas -- how many court

13   documents you've served in that time?

14   A.   It would be more than a thousand, for sure.

15   Q.   Thank you.

16             In your career as a process server, have you ever

17   served someone outside on the street?

18   A.   Yes.

19   Q.   Can you recall approximately how many times you've been

20   asked to do that and have done that?

21   A.   Maybe about three or four times.

22   Q.   In your career as a process server, have you ever been

23   asked to attempt service on someone where you were told that

24   the person you were serving would be at a particular place at a

25   particular time?

JALHMARH                            Benedetto - Direct

1    A.   Yes.

2    Q.   Can you recall on how many occasions you did that?

3    A.   A good percentage-wise would be about 85 percent.

4    Q.   Of your service attempts in the past?

5    A.   Sorry?

6    Q.   It would be 85 percent of your service attempts in the

7    past?

8    A.   I don't follow what you're saying.

9    Q.   85 percent of what?

10   A.   I usually get someone on the first attempt.

11   Q.   OK.   Let me rephrase the question.

12   A.   Right.

13   Q.   You mentioned that you've been asked to serve people over

14   1,000 times within the state of New York?

15   A.   Right.

16   Q.   Have any of those times been where you were asked to serve

17   a particular person at a particular place and at a particular

18   time that you knew before the service attempt?

19   A.   Yes.

20   Q.   Do you know approximately how many times you've done that?

21   A.   About -- mostly all the time.

22   Q.   OK.   Thank you.

23        Have you ever had a service attempt challenged as

24   improper in your career as a process server?

25   A.   Yes, I did.

JALHMARH                          Benedetto - Direct

1   Q.  How many times?

2   A.  Once.

3   Q.  Do you recall approximately when that was?

4   A.  That was maybe less than eight years ago.

5   Q.  Do you remember anything about the service attempt that was

6   challenged in that instance you're talking about?

7   A.  Yes.  Specifically, yes.

8   Q.  Can you very briefly, for the Court, just describe that

9   service attempt.

10  A.  OK.  It was a snowy day, and I was with an associate of

11  Action Subpoena, and we were on our way to White Plains, New

12  York, to serve a summons and complaint.

13          Can I say the name of the company?

14  Q.  I don't think that's necessary, but you do what you want.

15  A.  A veterinarian service, a summons and complaint.  And the

16  gentleman with me, his name was Al.  He walked me up into the

17  building because it hadn't been plowed.  When we arrived

18  inside, there was a young lady sitting at the desk, and I

19  asked -- I told who I was, I identified myself, and I explained

20  I have to serve doctors -- the doctors here at this particular

21  veterinarian service a summons and complaint, and she asked me

22  to just wait one second.  She had to go in the back and speak

23  with the doctor.  For me, I identify myself and -- just to make

24  her feel comfortable because she was a little nervous.

25          So she went in the back and then she came back, and

JALHMARH                              Benedetto - Direct

1  she was nervous and she said the doctor will not come.  So at

2  that point in time I says, well, this is going to be a summons

3  and complaint drop service, and I left it on her desk.

4  Q.  Do you recall why the service attempt that you're

5  describing was challenged?

6  A.  Maybe they weren't familiar with drop service.  That's only

7  thing I can come up with.

8  Q.  Did you attend a traverse hearing in connection with that

9  challenge?

10  A.  Yes, we did.

11  Q.  Do you recall what the outcome of that traverse hearing

12  was?

13  A.  That they dismissed them, the defendant.

14  Q.  Was the service in that case deemed effective?

15  A.  Was it what?

16  Q.  Deemed effective?

17  A.  It was effective, yes.

18         MR. BAUM:  Your Honor, this is all background, so it's

19  fine, but we're getting pretty far afield from the facts of

20  this case.

21         THE COURT:  I think that's right, and I've already

22  read about it in her declaration, so why don't we move on.

23         MR. GALLO:  Thank you, your Honor.

24  Q.  When did you first learn you were being asked to serve

25  Mr. Beck?

JALHMARH                         Benedetto - Direct

1    A.  The day before, August 24.

2    Q.  How did you learn about that service attempt?

3    A.  Well, the lady at -- my boss told me that she was waiting

4    for some papers to come to serve him.  It was a rush service.

5    Q.  Did you receive those papers?

6    A.  Yes, I did.

7    Q.  What did you do after you received those papers?

8    A.  Well, I read them, and then I had to go out to Port Chester

9    that evening.

10   Q.  Do you recall what those papers were?

11   A.  A summons and complaint.

12   Q.  Do you recall who the defendant was?

13   A.  I believe his name is Jeff Margolis or Margouleff.

14   Q.  Do you recall who the defendant was, the person you were

15   serving?

16   A.  Jeff Beck.

17   Q.  You said you drove to Port Chester.  Where did you drive in

18   Port Chester?

19   A.  I'm sorry.

20   Q.  Where did you drive to?

21   A.  Capitol Theatre on Westchester Avenue.

22   Q.  Why did you drive there?

23   A.  That's where the venue was.

24   Q.  The venue for what?

25   A.  For Jeff Beck's concert.

JALHMARH                          Benedetto - Direct

1   Q.  Jeff Beck was doing a concert?

2   A.  Yes.

3   Q.  Do you know when he was scheduled to do a concert?

4   A.  I believe it was around 8 o'clock.

5   Q.  Was it the same evening you drove to Port Chester?

6   A.  Yes.

7   Q.  Do you remember approximately when you arrived at the

8   theater?

9   A.  Usually I arrive, like, maybe 45 minutes ahead of time, so

10  I think I got there around five after 7:00.

11  Q.  What did you do when you arrived?

12  A.  I called my boss and told her that I had arrived, and I was

13  given a description of the layout of what I was seeing when I

14  parked the car.

15  Q.  What did you do after you parked?

16  A.  I went out to the street to cross the street, and I started

17  taking photos of the bus, the tour bus.  There were two buses

18  there.

19  Q.  You said there were two buses there.  Were those two buses

20  near the venue?

21  A.  No, they were further towards the Westchester Avenue side,

22  the cross street.

23  Q.  You said that they were tour buses.  How did you know they

24  were tour buses?

25  A.  They were very large.  They were bigger than a Greyhound

JALHMARH                          Benedetto - Direct

 1    bus, and I just assumed they would be them.

 2    Q.   What did you do after taking pictures of the area?

 3    A.   I called up Gail and sent her the photos, and I walked

 4    around a little bit.  And then exactly right opposite the No. 1

 5    tour bus that Jeff Beck was in, there was a restaurant, a

 6    kitchen door that was open from a restaurant that was on

 7    Westchester Avenue, on Westchester Avenue and the corner of

 8    Broad Street, and it was well lit.  There was a man in there

 9    washing dishes, and then he -- every now and then he would come

10    back.  There were steps, and I sat on the steps, about the

11    second or third step, right directly in front of the tour bus

12    door.

13               THE COURT:  Do you remember if the buses were on?

14               THE WITNESS:  Yes.

15    Q.   How close was the stoop where you sat on to the bus, the

16    first bus?

17    A.   Well, I was sitting on the stoop, so I would say exactly

18    where this lady is sitting right here with the glasses.

19    Q.   That's how -- I'm sorry.  That's the distance between the

20    stoop and --

21    A.   Yeah.

22    Q.   -- and the bus?

23    A.   Yes.

24    Q.   Where were you in relation to the door on the bus?

25    A.   Right in front of it.

JALHMARH                          Benedetto - Direct

1    Q.  What happened next?

2    A.  Well, I sat there for a few minutes, about maybe

3    15 minutes, and then I saw some men coming, approaching the

4    bus.  So then at that point in time, I knew that they were

5    getting ready to do the concert because it was a little after

6    8:00, actually.  And what happened was they walked to the bus,

7    and as soon as the door opened, I stood up and I saw Mr. Beck,

8    just like I'm looking at you right now.  And I stood up and I

9    yelled out to him that my name was Linda Benedetto.  I'm a

10   process server.  I'm here to serve you a summons and complaint.

11   Q.  How did you know that the person coming out of the bus was

12   Mr. Beck?

13   A.  I knew what he looked like.

14   Q.  How did you know what he looked like?

15   A.  Well, he's a performer, and many years ago I had gone to

16   one of his concerts.

17          THE COURT:  How far were you from him when you said

18   that?

19          THE WITNESS:  Exactly right where this lady is, but I

20   was standing at that point.

21          THE COURT:  Referring to the court reporter, so --

22          THE WITNESS:  Right where Mr. Gallo is, not that far

23   away, even closer, because the sidewalk --

24          THE COURT:  Four feet?  What do we think?

25          THE WITNESS:  Not even.

JALHMARH                      Benedetto - Direct

 1                MR. GALLO:  Probably a little more than four feet.

 2                MR. BAUM:  This distance between the attorney and the

 3     witness box?

 4                THE COURT:  Between the witness and the court

 5     reporter.

 6                MR. BAUM:  Oh, I'm sorry.

 7                MR. GALLO:  OK.

 8                THE COURT:  Was he facing you?

 9                THE WITNESS:  Yes.  When he got off the steps, he was

10     facing -- he had to face me.  When he was coming down the

11     steps, I stood up.  So when the door was open, he had to have

12     seen me.  He has to watch where he's walking.

13                THE COURT:  Did you make eye contact with him?

14                THE WITNESS:  Yes.

15     BY MR. GALLO:

16     Q.  You mentioned that you said something to him when you stood

17     up.  What did you say exactly, if you can recall?

18     A.  I didn't say it.  I yelled it.

19     Q.  Can you say it -- if it please the Court -- can you say it

20     the way that you recall saying it to Mr. Beck that night?

21                THE COURT:  Let's turn off the microphone.

22                MR. GALLO:  Yes, good idea.

23                THE COURT:  Press that button.

24                THE WITNESS:  Right here?

25     BY MR. GALLO:

JALHMARH                          Benedetto - Direct

1    Q.  Would you mind?

2    A.  OK.  "Jeff Beck, my name is Linda Benedetto.  I'm a process

3    server.  I'm here to serve you a summons and complaint."

4    Q.  When you said that, were you holding anything?

5    A.  Yes, the papers in my hand.

6    Q.  What did Mr. Beck do in response to hearing you say that,

7    if anything?

8    A.  Got off the bus, and he just started walking fast towards

9    the venue, and the two gentlemen were in back of him.

10   Q.  So he got off the bus, and he started walking towards the

11   venue.  Was that left out of the bus?  Right out of the bus?

12   Do you remember?

13   A.  No, that would be right.

14   Q.  OK.

15            MR. NICYPER:  Do you want the microphone --

16            MR. GALLO:  Yes, that makes sense.  Would you mind

17   pressing the button to turn on the microphone again.  Thank

18   you.

19   Q.  What did you do when Mr. Beck started walking from the bus

20   towards the venue?

21   A.  I kept repeating the same thing that I just said up until

22   the time that we got to the stage door.  When we got to the

23   stage door, then I -- instead of saying that I had the summons

24   and complaint, I said this is drop service on a summons and

25   complaint.

JALHMARH                          Benedetto - Direct

1   Q.  When you were saying those things, did you stay on the

2   stoop?

3   A.  I'm sorry?

4   Q.  When you were saying those things, did you stay on the

5   stoop?

6   A.  No, I was walking behind them.

7   Q.  Do you recall approximately how far behind them you were

8   walking?

9   A.  Well, in the beginning, when he first got off the bus and I

10  made that first announcement, I was closer to the gentlemen

11  that were in back of him.  But they proceeded to walk much

12  faster, and I thought it would be safe for me to stay back

13  because I don't -- I didn't feel protected with anyone to help

14  me out.  So that's one of the reasons why, but I was in walking

15  distance with them.

16  Q.  Do you know approximately how far behind them you were when

17  you were walking or --

18  A.  Maybe about -- not that far back.  Maybe ten feet, not

19  even.

20  Q.  Did Mr. Beck respond to you at any point while you were

21  walking behind him?

22  A.  Never.

23  Q.  Approximately how many times would you say that you spoke

24  to Mr. Beck during the walk between the bus and the venue?

25  A.  Oh, from that, at least 15 times.

JALHMARH                        Benedetto - Direct

 1              THE COURT:  Have you seen the video of the walk?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Do you see yourself yelling in it?

 4              THE WITNESS:  No, I didn't see that part.  There's no

 5     sound.

 6              THE COURT:  When you look at yourself walking behind

 7     him, can you identify yourself trying to yell?

 8              THE WITNESS:  I didn't see that in the video.

 9              THE COURT:  OK.

10              THE WITNESS:  I can't see that.

11              THE COURT:  Did you draft your affidavit or

12     declaration yourself, what was stated here?

13              THE WITNESS:  The declaration page?

14              THE COURT:  Yes.  Did you write these words?

15              THE WITNESS:  My affidavit of service, I did.

16              THE COURT:  But this declaration that was submitted to

17     the Court, did you sign this?

18              THE WITNESS:  I don't see the signature on this.

19              THE COURT:  Look at the last page, on the back.

20              THE WITNESS:  Oh, I see.  OK.

21              THE COURT:  Do you remember signing that?

22              THE WITNESS:  Yes, I do.

23              THE COURT:  In here you don't say exactly what you say

24     today.  You say that you sat on the stoop of a restaurant,

25     paragraph 9; that the stoop was approximately six feet from the

JALHMARH                        Benedetto - Direct

1  bus; and that at approximately 8:22, you recognized the person
2  exiting the bus as Beck.  And then you say:  "Defendant began
3  walking toward the concert venue with three other men, some or
4  all of whom appeared to me to be security guards.  As Beck and
5  the men he was with walked towards the venue, I stood up and
6  walked towards Beck.  As the defendant was walking towards the
7  venue, when I was approximately five feet behind the defendant,
8  I yelled clearly and loudly that I was a process server."
9          But you don't say anything about this kind of
10  face-to-face yelling at him that you're a process server within
11  four feet of him.
12          Do you want to continue?
13          MR. GALLO:  Yes, your Honor.  Thank you.
14  BY MR. GALLO:
15  Q.  When you were walking behind him, can you describe or
16  recall what you were saying to him?
17  A.  Yes.
18  Q.  What were you saying to him?
19  A.  "Jeff Beck, my name is Linda Benedetto.  I'm a process
20  server.  I'm here to serve you with summons and complaint."
21  Q.  I don't think we need to do it for the Court again, but
22  approximately what volume are you saying that?  Was it
23  comparable?
24  A.  Same previous volume.
25  Q.  When you were walking behind Mr. Beck, did you notice any

JALHMARH                              Benedetto - Direct

 1    noise outside of your own voice?

 2    A.   It wasn't noisy.  It was just the sound of the bus, but we

 3    had passed that and I had still been talking, so -- yelling,

 4    excuse me.

 5    Q.   Now, the judge just asked you some questions about your

 6    declaration and your testimony today.  Is there a reason why, a

 7    particular reason why, you didn't mention the face-to-face

 8    communication to Beck in your declaration?

 9    A.   No, I don't know why.

10    Q.   All right.  Now, you said that you followed Mr. Beck from

11    the bus to the stage door.  Did you notice any other people on

12    the sidewalk besides Mr. Beck and the people he was walking

13    with?

14    A.   No.

15    Q.   Did you notice any fans, fans of Mr. Beck?

16    A.   Any what?

17    Q.   Any fans of his on the street?

18    A.   No.

19    Q.   Anybody try to seek an autograph from Mr. Beck?

20    A.   No.

21    Q.   Did you notice if Mr. Beck was wearing any headphones?

22    A.   No.

23    Q.   You said that Mr. Beck did not respond to any of your

24    statements --

25    A.   That's correct.

JALHMARH                              Benedetto - Direct

 1  Q.  -- while you were walking behind him.  Did any of the other
 2  men respond to any of your statements?
 3  A.  I remember one in particular had turned around.
 4  Q.  Do you recall which person that he was?
 5  A.  The one on the right-hand side of the bus walking down.  I
 6  was at least going by bus two, and at that time he turned.  He
 7  was on the right side.
 8  Q.  What happened when Mr. Beck reached the door to the venue?
 9  A.  Well, at that point in time, I started going into the
10  doorway.  And as I had previous said, I kept saying that my
11  name is Linda Benedetto.  I'm a process server.  At that point
12  in time, I knew that he wasn't going to accept the papers.  So
13  what I did was I said "This is a drop service" after I
14  announced who I was, and that I was serving him a summons and
15  complaint.  And I said it louder at that point in time so there
16  would be witnesses to attest that I did say that.
17  Q.  So Mr. Beck gets to the door.  What did he do when he
18  reached the door?
19  A.  They just kept walking in.
20  Q.  After he walked in, what did you do with the papers in your
21  hand?
22  A.  Oh, I tossed them on the floor inside the venue.
23  Q.  Can you recall approximately how long after Mr. Beck walked
24  into the venue that you threw the papers?
25  A.  Instantly.

JALHMARH                        Benedetto - Direct

1    Q.  What did you say exactly, or to the best of your

2    recollection, when you threw the papers into the doorway?

3    A.  "Jeff Beck, my name is Linda Benedetto.  I'm a process

4    server to serve you a summons and complaint with drop service."

5    Q.  And how loudly did you say it?

6    A.  The same tone that I had said in the previous when I just

7    did that before.

8    Q.  Have you ever attempted drop service on anybody else in

9    your career as a process server?

10   A.  Yes, several times.

11   Q.  To your knowledge, has anyone ever challenged the

12   effectiveness of any of your other attempts at drop service?

13   A.  Just like I said before, to that veterinarian service.

14   Q.  What happened after you threw the summons and complaint

15   into the door after Beck walked into it?

16   A.  I left and I walked over to my car that was -- my Jeep that

17   was parked in the parking lot across the street.

18   Q.  What happened after you reached your car?

19   A.  Two policemen approached me and told me they were called.

20   Q.  What did the policemen say to you, if anything?

21   A.  Well, we had a complaint that -- I don't remember exactly

22   what they said, but I said -- I explained to them that I was a

23   process server, and they had the papers in their hand.

24   Q.  The police officers had the papers?

25   A.  Yes.  I said:  Doesn't matter.  He's already been served.

JALHMARH                          Benedetto - Direct

 1   It was a drop service.  And at that point in time, I called up
 2   my boss, and she tried talking to them, explaining to them that
 3   procedure, because they weren't familiar with it.
 4   Q.  What did they do with the papers after speaking with you?
 5   A.  They handed them back to me.
 6   Q.  What did you do with them after that?
 7   A.  Well, I couldn't throw them away.  I didn't want to do
 8   that, so I just walked over to the bus and dropped them by the
 9   bus door.
10   Q.  The bus you're referring to, is that --
11   A.  Bus one.
12   Q.  The tour bus?
13   A.  Yes.
14   Q.  I'd like to show you the videos that are being offered as
15   evidence at the hearing today.
16   A.  OK.
17            MR. GALLO:  Would you play the outside video.
18            (Video played)
19   Q.  Can you see the video, Ms. Benedetto?
20   A.  Yes.
21            MR. GALLO:  Can you start it from the beginning
22   please, Lalindra.
23   Q.  I'd like you, if you would, please look at the video, and
24   we'll watch it in its entirety and then I will ask you a few
25   questions about it.

JALHMARH                              Benedetto - Direct

```
 1              (Video played)
 2              MR. NICYPER:  Your Honor, I apologize.  We can't get
 3    this off the screen.
 4              THE DEPUTY CLERK:  Can you just pause it for a second.
 5              MR. GALLO:  Yes.
 6              (Discussion off the record)
 7              MR. GALLO:  Thank you very much.
 8              MR. SANICHAR:  Shall I restart?
 9              MR. GALLO:  Would you mind?
10              (Video played)
11              MR. GALLO:  Thank you.
12    BY MR. GALLO:
13    Q.  Have you seen the video?
14    A.  Yes.
15    Q.  Does that video represent a complete record of your attempt
16    to serve Mr. Beck that night?
17    A.  No, not at all.
18    Q.  What's missing from that?
19    A.  Well, it's missing half of it from the point where the
20    buses were parked up until where the truck was.  So we're
21    looking at him coming out of the bus, me walking behind him, me
22    announcing it repeatedly.  So it's like half -- half of the
23    video.
24    Q.  The video did not have any audio.  Were you speaking to
25    Mr. Beck during the events in that video?
```

JALHMARH                          Benedetto - Direct

1   A.   Yes.

2   Q.   What were you saying?

3   A.   "Jeff Beck, my name is Linda Benedetto.  I'm a process

4   server.  I'm here to serve you a summons and complaint."

5            MR. GALLO:  I'd like to show the second video,

6   Lalindra, please.

7   Q.   I'm going to show another video.  We'll watch that as well.

8   If there's no objection, I might start that at the 30 second

9   mark.

10           I'm sorry.  You can't hear me?

11           (Discussion held off the record)

12  BY MR. GALLO:

13  Q.   Can you see the video?

14  A.   Yes.

15           (Video played)

16  Q.   Thank you.

17           The video shows you throwing something into the

18  doorway after Mr. Beck entered it.  Do you recall what that

19  was?

20  A.   That was the summons and complaint.

21  Q.   Did you say anything when you threw it?

22  A.   Yes.

23  Q.   Do you recall what you said?

24  A.   The exact same things, other than the fact that I said at

25  the end, "This is a drop service."

JALHMARH                              Benedetto - Direct

1   Q.  You said that it was --

2   A.  "My name's Linda Benedetto.  I'm a process server.  I'm

3   here to serve you a summons and complaint drop service."  But I

4   did announce his name.  I said "Jeff Beck."

5              THE COURT:  Do you want to freeze frame where that

6   happened.

7              MR. GALLO:  Yeah, we can do that.

8              THE COURT:  OK.

9              MR. GALLO:  Thank you, your Honor.

10             Yeah, just a few more seconds back, please.  Maybe one

11  more second.  Perhaps one more second.  Great.  Thank you.

12  BY MR. GALLO:

13  Q.  Ms. Benedetto, if you would, could you please turn your

14  microphone off and say what you said to Mr. Beck as you said it

15  to the best of your recollection.

16  A.  "Jeff Beck, my name is Linda Benedetto.  I'm a process

17  server serving you a summons and complaint by drop service."

18  Q.  Thank you.

19             THE COURT:  You said all of that while you were at the

20  door?

21             THE WITNESS:  Yes.

22             MR. GALLO:  Thank you.

23             I have no further questions.

24             THE COURT:  Thanks.

25             Cross-examination.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JALHMARH                          Benedetto - Cross

1   CROSS-EXAMINATION

2   BY MR. BAUM:

3   Q.  Good morning.

4   A.  Good morning.

5   Q.  Could you please once again tell me the correct

6   pronunciation of your last name.

7   A.  Benedetto.

8   Q.  Benedetto?

9   A.  Yes.

10  Q.  Thank you.  Thank you for coming here today.  I have some

11  questions.

12          MR. GALLO:  Did she turn her microphone back on?

13  Q.  Did you turn your microphone back on?

14  A.  Yes, it is on.

15  Q.  Thank you.

16  A.  Can you hear me?

17  Q.  I can hear you.

18          I would like to start with the return of service that

19  was filed in this case.  Do you recall that document?

20  A.  What document are we speaking about?

21  Q.  The return of service.

22  A.  What do you mean by "return of service"?

23  Q.  Are you familiar with a document that's called a return of

24  service?

25  A.  No, not at all.

JALHMARH                              Benedetto - Cross

1    Q.  Have you ever seen a document that's called a return of

2    service?

3    A.  No.

4    Q.  How many years have you been a process server?

5    A.  25 to 30 years.

6    Q.  And in those 25 to 30 years, have you never seen a document

7    titled a "Return of Service"?

8    A.  I never received any.

9    Q.  Have you ever drafted any?

10   A.  No.

11   Q.  Have you ever signed any?

12   A.  No.

13   Q.  Did you draft or sign one in this case?

14   A.  I didn't sign a return of service.

15        MR. BAUM:  Your Honor, may I approach the witness with

16   a document?

17        THE COURT:  Yes.

18        MR. BAUM:  Your Honor, do you have the return of

19   service with you?  I can hand up the document as well.

20        THE COURT:  If you have an extra copy, why don't you.

21   I'm sure I have one, but that will be more efficient.  Thank

22   you.

23        MR. GALLO:  I have a copy.  Thank you.

24        MR. BAUM:  Your Honor, how would you like us to mark

25   exhibits for this hearing?  I do not have very many.

JALHMARH                        Benedetto - Cross

1          THE COURT:  Yes, you should use letters; plaintiff

2    should use numbers.

3          MR. BAUM:  I would like to mark this as Beck Exhibit

4    A.

5          MR. GALLO:  No objections.

6          THE COURT:  Fine.

7    BY MR. BAUM:

8    Q.  Ms. Benedetto, do you see the document that I've handed

9    before you marked Beck Exhibit A?

10   A.  Yeah, that's my copy of my affidavit of service.

11   Q.  Can you point for me where this document refers to the word

12   "affirmation" or "affidavit"?

13   A.  Sorry.

14   Q.  Strike that.

15          Do you see the top of the document it says "Return of

16   Service"?

17   A.  Yes.

18   Q.  This is a return of service, correct?

19   A.  That is, yes.

20   Q.  And you signed this document, correct?

21   A.  Yes.

22   Q.  Did you draft this document?

23   A.  Did I draft it?

24   Q.  That was my question, yes.

25   A.  My boss drafted it, and I was there when she did it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JALHMARH                              Benedetto - Cross

 1    Q.   Who was -- what is the name of your boss?

 2    A.   Gail Kagan, Action Subpoena.

 3    Q.   I see.  And she was with you the night you attempted

 4    service of Mr. Beck?

 5    A.   No.  She was on the phone with me throughout the whole

 6    process.

 7    Q.   I see.  And she drafted it based on what you told her on

 8    the phone?

 9    A.   Yes, definitely.  And then the next day I went to her

10    office and we spoke.

11    Q.   I see.  On what computer did she draft this document?

12    A.   On her computer.

13    Q.   Do you remember whether she had any assistance from anybody

14    in drafting the document?

15    A.   Not to my knowledge.

16    Q.   Are you aware of whether she consulted with the counsel for

17    the plaintiff while drafting the document?

18    A.   No, I'm not.  I'm not aware of that.

19    Q.   Did you consult with -- and this is a yes-or-no question --

20    did you consult the counsel for the plaintiff when this

21    document was being drafted?

22    A.   I might have.  I don't remember.

23    Q.   When would you might have?

24    A.   I don't know.

25    Q.   Well, do you recall any information that was exchanged

JALHMARH                          Benedetto - Cross

1   between you and plaintiff counsel prior to drafting this

2   document?

3   A.  I believe I received an email to look it over.

4   Q.  You received an email from whom?

5              MR. NICYPER:  Objection, your Honor.

6              THE COURT:  What's the objection?

7              MR. NICYPER:  First off, there's no recollection that

8   she has that she had this communication.  Second, if there was,

9   it would be, well, communication with counsel.

10              MR. BAUM:  I don't believe she was represented by

11   counsel.  In addition, she did testify just now -- I mean, it's

12   inconsistent with testimony, but the last answer that I heard

13   was that she did receive an email regarding looking over the

14   document.

15              THE WITNESS:  I made a mistake.  It's not this.  It

16   was the declaration page also.

17              THE COURT:  Just to be clear, there's still an

18   outstanding objection to whether there was an email from

19   plaintiff's counsel?

20              MR. BAUM:  Your Honor, are you asking me to respond to

21   that question?

22              THE COURT:  Yes.  I just want to be clear what the

23   standing objection is to.

24              THE WITNESS:  No, from Action Subpoena, not from them.

25              MR. BAUM:  Forgive me, your Honor.  I'm now very

JALHMARH                        Benedetto - Cross

 1  confused.  If the objection is to whether there was a

 2  communication that was attorney-client privilege --

 3            MR. NICYPER:  I'll withdraw.

 4            MR. BAUM:  -- I believe the witness has -- you

 5  withdraw the objection?

 6            THE COURT:  The objection's withdrawn.

 7            MR. BAUM:  Fair enough.

 8  BY MR. BAUM:

 9  Q.  When you signed the return of service that I've handed to

10  you as Exhibit A, did you understand that the document would be

11  filed with the court?

12  A.  Yes.

13  Q.  Is it fair to say that at the time that you signed the

14  document, you did not anticipate anybody would test the

15  accuracy of the document?

16  A.  No, I wouldn't say that.

17  Q.  You thought that somebody might challenge the accuracy of

18  the document?

19  A.  I don't follow what you're trying to say.

20  Q.  My question is when you drafted the document -- strike

21  that.

22            I believe you said you did not draft the document,

23  correct?

24  A.  Go ahead.

25  Q.  Am I correct?

JALHMARH                          Benedetto - Cross

1   A.   That I didn't draft the document?

2   Q.   You testified that you did not draft Exhibit A, correct?

3   A.   I spoke with Gail.  We were talking together.  I was

4   explaining the whole thing with her and she was typing it up,

5   writing it down.

6   Q.   OK.

7            THE COURT:  We're talking about the return of service

8   now.

9   Q.   Yes, we're only discussing the return of service.  We're

10  not talking about a declaration that was signed.

11  A.   All right.  I got confused on that.

12  Q.   You are confused?

13  A.   No, at that point what you said, I was confused.

14  Q.   At the time that you signed -- strike that.

15           When did you sign this document that's marked as

16  Exhibit A, that being the return of service?

17  A.   I don't recall.

18  Q.   You don't recall?

19  A.   Back in 2018.

20  Q.   So your testimony is you only recall that you signed it at

21  some point in the year 2018?

22           THE COURT:  Do you want to repeat that?

23           MR. BAUM:  Yes.

24  Q.   Is it your recollection that --

25  A.   I believe it was on the 16th of August, the next day.

JALHMARH                          Benedetto - Cross

1   Q.  I see.  You did not, in fact, date the document when you

2   signed it, is that correct?

3   A.  I'm sorry?

4   Q.  You did not date the document when you signed it, is that

5   correct?

6   A.  Did I date it?

7   Q.  Yes.

8   A.  No, I don't date it.

9   Q.  Is there a reason that you did not date it?

10  A.  Gail, Gail from Action Subpoena, dates it.

11  Q.  I see.  Can you please point to me where that document is

12  dated.

13  A.  I don't see it.

14  Q.  Would you agree with me that the date is actually not

15  included on the document; that it is not dated?

16  A.  What is it you're asking me now?

17  Q.  My question is whether you would agree with me that the

18  document marked as Exhibit A, the return of service, is not

19  dated?

20          MR. GALLO:  I'm sorry.  I'd like to object, your

21  Honor.  I believe there are two dates on this.

22          MR. BAUM:  Excuse me.  Please don't speak when you

23  object.  The Court can certainly understand the objection.

24          THE COURT:  Just tell me what the objection is.

25          MR. GALLO:  Sure, your Honor.  He's mischaracterizing

JALHMARH                          Benedetto - Cross

1   the document.  There are two dates on this document.

2              THE COURT:  Just rephrase.  You can ask the question;

3   Ms. Benedetto can answer.

4              MR. GALLO:  Thank you, your Honor.

5              THE COURT:  And you can clarify anything on redirect.

6              MR. GALLO:  Thank you.

7   MR. BAUM:

8   Q.  I don't want to spend too much time on it, but would you

9   agree with me that the document is actually not dated?

10  A.  Yes.

11  Q.  Now, I believe I asked a question, but the testimony got a

12  little bit interrupted.  My apologies for that.

13             At the time that you signed the document, did you

14  anticipate that somebody might challenge it in court?

15  A.  No.

16  Q.  When the return of service was drafted, did you know that

17  there were actually surveillance videos taken of the sidewalk

18  and the entrance to the stage venue at the theater?

19  A.  At that particular time, no.

20  Q.  Had you seen the videos prior to drafting the return of

21  service, it might have been drafted a bit differently, am I

22  correct?

23  A.  Did I see the videos?

24  Q.  I believe you answered that you did not see the videos?

25  A.  Yes, yes.  I'm sorry.

JALHMARH                          Benedetto - Cross

1    Q.  If you had seen the videos prior to writing up the return

2    of service, would you agree with me that you would have drafted

3    the return of service a bit differently?

4    A.  I -- I'm not following what you're trying to say to me.

5    Q.  If you saw the videos --

6    A.  You're not telling me when did I see --

7    Q.  When did you see the videos?

8    A.  It was -- I served on the 18th -- 2018.  I didn't see the

9    videos up until 2019.

10   Q.  I believe you served on the 15th, not the 18th, correct?

11   A.  Right.

12   Q.  But your testimony is that you saw the videos in 2019, so

13   that would be more than six months later?

14   A.  Probably so, yes.

15   Q.  Had you seen the videos when you actually drafted the

16   document titled return of service?

17   A.  I don't recall.

18   Q.  I understand that you don't recall seeing the videos.  If

19   you had seen the videos, you would have written the document a

20   bit differently, am I correct?

21   A.  I would think so.

22   Q.  In fact, you took some liberties to embellish the events

23   stated in the return of service, isn't that correct?

24   A.  What do you mean by that?

25   Q.  I mean that it's not quite accurate, is it?

JALHMARH                                    Benedetto - Cross

1    A.   It's 100 percent accurate.

2    Q.   For example, do you see in the document that you state that

3    after Mr. Beck passed you on the street on the evening of the

4    purported service, you followed him and you were "right behind

5    the guard, right behind Mr. Beck"?

6    A.   Yes.

7    Q.   You're looking at me, but do you see that in the document?

8    A.   Yes -- no, it's not.

9    Q.   It's not in the document?

10   A.   I was behind him.

11   Q.   Right.  Were you right behind him?

12   A.   Yes, I was behind him.

13   Q.   My question was whether you were right behind him?

14   A.   If I'm behind him, I'm behind him.

15   Q.   Right.  The statement that you were right behind him was

16   intended to suggest that you were in close proximity to

17   Mr. Beck, correct?

18   A.   I would view that as an assumption.  I'm right behind him.

19   Q.   My question is when you wrote that you were right behind

20   him, you intended to convey a close proximity between you and

21   Mr. Beck, correct?

22   A.   I believe that was close.

23   Q.   But, in fact, you were 10 to 15 feet behind Mr. Beck,

24   correct?

25   A.   Still behind him.

JALHMARH                          Benedetto - Cross

1    Q.   But not quite close behind him, were you?

2    A.   There were points in time when I wasn't that close, when

3    they started walking a little faster.

4    Q.   Well, wouldn't you agree with me that you were, in fact, 10

5    to 15 feet behind Mr. Beck during the entirety of the walk?

6    A.   No.

7    Q.   That's not true?

8    A.   No.

9    Q.   It is not true that for the entire duration of the walk you

10   were 10 to 15 feet behind him?

11   A.   Not at all.  This is only part of the video.

12   Q.   I see.  So if, for example, Mr. Beck wrote that you were 10

13   to 15 feet behind him for the entire duration of the walk

14   between the bus and the door of the venue, that statement would

15   be incorrect?

16   A.   My statement?

17   Q.   If someone were to say to you that you followed Mr. Beck

18   and that you were 10 to 15 feet behind him for the entire

19   duration of the walk between the bus and the door into the

20   venue, that statement would be incorrect?

21   A.   Yes.

22             MR. BAUM:  Your Honor, may I approach the witness to

23   show?

24             THE COURT:  You may.

25             MR. BAUM:  Your Honor, do you have the declaration of

JALHMARH                          Benedetto - Cross

```
 1   Ms. Benedetto?

 2           THE COURT:  I do.

 3   BY MR. BAUM:

 4   Q.  Ms. Benedetto -- for the Court, I'd like to mark this as

 5   Beck Exhibit B.

 6           Ms. Benedetto, I'd like for you to identify for us the

 7   document I just handed to you as Exhibit B.

 8   A.  Declaration of Linda Benedetto.

 9   Q.  And you signed this document, correct?

10   A.  Yes.

11   Q.  And you signed it under oath, correct?

12   A.  I don't recall -- yes.

13   Q.  Sorry.  Did you say you don't recall whether you signed it

14   under oath?

15   A.  Yes, I did.

16   Q.  Is your answer that, yes, you did sign the document under

17   oath?

18           THE COURT:  That was a yes?  Sorry, I didn't hear you.

19   A.  Yes.

20   Q.  Under penalties of perjury, correct?

21   A.  Yes.

22   Q.  Can you please turn to paragraph 13, which is on page 3 of

23   the document.

24           In paragraph 13, you describe that you followed the

25   defendant for approximately several hundred feet, correct,
```

JALHMARH                              Benedetto - Cross

1   that's what it says in the beginning?

2   A.   That's correct, yeah.

3   Q.   And then referring to that several hundred feet, you write,

4   "I was approximately 10 to 15 feet behind defendant for the

5   entire duration of his walk between the bus and the door into

6   the venue."

7            Do you see that statement?

8   A.   That's probably so, correct.

9   Q.   I understand.  So now it's correct, that statement's

10  correct?

11  A.   Well, I might have left out the part from -- because when I

12  seen the whole view of the bus, that when he first got off, I

13  was pretty close to him.  I might have overlooked it.

14  Q.   I see.  Is this document accurate or not accurate?

15  A.   It's accurate.

16  Q.   I see.  Now I would like to return your attention to

17  Exhibit A, which is the return of service.

18           Here you say that as Mr. Beck approached and entered

19  the stage door, you "tossed the documents to his feet," am I

20  correct?

21  A.   Yes.

22  Q.   You do say that in the document, correct?

23  A.   Yes.

24  Q.   You also say that the documents "landed by his feet in the

25  stage door," correct?

JALHMARH                           Benedetto - Cross

1   A.  Yes.

2   Q.  But in reality, the documents did not actually land at

3   Mr. Beck's feet in the stage door, is that correct?

4   A.  They landed inside the venue on the floor by his feet.

5   There's no -- I didn't determine that that -- drop service is

6   drop service.  It doesn't matter how many feet away it is.

7   Q.  Your answer appeared to extend beyond the scope of my

8   question, which was they did not actually land by Mr. Beck's

9   feet, is that correct?

10  A.  I don't know if that video was stopped at that time.

11  Q.  I'm actually not asking about the video.  I'm asking about

12  what you stated in the return of service.

13          In the document you state that they landed at his

14  feet, but they did not actually land at his feet, is that

15  correct?

16  A.  Right.  And it didn't indicate how far away he was either.

17  Q.  Well, can you explain for the Court what "landed by his

18  feet" means?

19  A.  Just what I said.  When they opened up the door, he walked

20  in, I was behind him, and I tossed it.  I mentioned to him, I

21  stated -- I was yelling to him that I was a process server.

22  I'm here to serve him a summons and complaint and it's drop

23  service, and I tossed it.  And at that point in time when I

24  tossed it on the floor inside the venue, that's considered

25  service.  And he was walking fast.

JALHMARH                              Benedetto - Cross

1    Q.  Did you see the documents land by his feet?

2    A.  Yes, I did.

3    Q.  I'd like to show you a video, if I may.

4            Your Honor, can you see the video that's on the

5    screen?

6            THE COURT:  I can, yes.  Thank you.

7    Q.  Ms. Benedetto, can you see a video that's paused inside the

8    screen?

9            MR. SANICHAR:  That's actually my screen.

10           MR. BAUM:  What just happened?

11           MR. GALLO:  That was our screen.

12           MR. BAUM:  But it should be mine.  Let me try.  OK.  I

13   believe this is correct.

14   BY MR. BAUM:

15   Q.  Ms. Benedetto, I'm going to play a very short video for

16   you, and I'd like you to watch it.

17   A.  OK.

18           MR. NICYPER:  Your Honor, we have the same objection,

19   that this video's been altered.

20           THE COURT:  In terms of authenticating the video and

21   talking about whether anything could have been cut from it, who

22   would be the best person to address that, or would have been

23   the best person to address that?

24           MR. BAUM:  It would be Thomas Bailey who did address

25   it in the affidavit that was submitted to the Court, I believe,

JALHMARH                        Benedetto - Cross

1    over a year ago.  There was simply no objection to this video

2    in the briefing or at any time in the past year.

3              THE COURT:  All right.  In any event, I've seen it

4    before.  Why don't we hear the testimony, and then I'll decide

5    whether or not I even need to rely on the video.

6              MR. BAUM:  Fair enough.

7              (Video played)

8    BY MR. BAUM:

9    Q.  Now I just paused the video.  Am I correct that I paused

10   the video at the moment that you dropped the documents at the

11   stage door?

12   A.  Well, I just saw something and then it stopped, and then

13   the papers are right here.

14   Q.  Thank you for that testimony.  My question is a different

15   one.

16   A.  I saw that freeze there.  I saw --

17   Q.  Did I freeze the video at the moment that you dropped the

18   papers?

19   A.  No, before that I saw something slide by real fast.

20   Q.  Would you agree that right there at that moment, which is

21   second 14, is the moment when the papers dropped?

22   A.  I can't tell by that, what you're doing.

23   Q.  Well, I can play the video several times, but do you see at

24   second 14 when it starts at second 14, there are no papers on

25   the ground?

JALHMARH                        Benedetto - Cross

1   A.  Well, I don't know that.

2   Q.  Well, the video does not show any papers on the ground,

3   correct?

4   A.  Not on this video, no.

5   Q.  Well, do you believe that we altered this video to remove

6   papers from the ground?

7   A.  I have no idea.

8   Q.  That's a pretty serious charge.  Looking at this video, do

9   you have any reason to believe that we somehow doctored the

10  video to remove papers from the video?

11  A.  I'm not seeing the papers on this video, that's what I'm

12  trying to say to you.

13  Q.  Right.  I'm trying to clarify that.

14          This is the moment, at second 14, the moment right

15  before the papers dropped, correct?

16  A.  It might have been.

17  Q.  Well --

18  A.  I'd have to look again.

19  Q.  OK.  I've just frozen the next frame which continues to

20  be --

21  A.  Now I see the papers.

22  Q.  You would agree with me at the moment I froze the frame at

23  the latter end of second 14 is when the papers dropped,

24  correct?

25  A.  Yes.

JALHMARH                              Benedetto - Cross

```
 1   Q.  Do you see Mr. Beck at the bottom half of the screen?
 2   A.  Yes, I see the back of his head, yeah, yeah.
 3   Q.  Approximately how far is Mr. Beck from the papers?
 4   A.  I can't gauge that.
 5   Q.  Well, do you believe it's more than one foot?
 6   A.  Yes.
 7   Q.  Do you believe it's more than two feet?
 8   A.  Yes.
 9   Q.  In fact, it's more than three feet, correct?
10   A.  Yes.
11   Q.  It's more than four feet, correct?
12   A.  Yes.
13   Q.  More than six feet, wouldn't you agree?
14   A.  Yes.
15   Q.  And you believe that papers landing -- now, by the way, you
16   testified earlier today that when Mr. Beck exited the bus, you
17   were approximately five feet from him, correct?
18   A.  That's correct.
19   Q.  Right.  And these papers were dropped more than six feet
20   away from him, correct?
21   A.  Right.
22   Q.  And you believe that is landing by his feet?
23   A.  Yes, it's in back of him.
24   Q.  I didn't ask you whether they were in back of him.
25   A.  That's the way -- but that's the way I interpret it.
```

JALHMARH                          Benedetto - Cross

1   Q.  You interpret it as landing by his feet?

2   A.  Right.

3   Q.  Now, of course, when you signed the declaration, you

4   omitted that part of the testimony, correct?

5   A.  What did I omit?

6   Q.  Excuse me?

7   A.  What part are you saying that I omitted that?

8   Q.  Well, my question -- my point is you actually didn't

9   include it anywhere in the declaration, correct?

10  A.  I'd have to look again.

11  Q.  Well, let me take a step back and try to streamline the

12  questioning.  May I?

13  A.  Go right ahead.

14  Q.  By the time you signed this -- the declaration that's

15  marked as Exhibit B is dated November 14, 2018, correct?

16  A.  Yes.

17  Q.  And you testified that by the time you signed this

18  declaration, you had already seen the videos, is that right?

19  A.  Yes.

20  Q.  You were concerned that the videos contradicted certain

21  aspects of your return of service, correct?

22  A.  Can you say that again.

23  Q.  You were concerned that the videos did not line up

24  precisely with the document that was marked as Exhibit A, the

25  return of service?

JALHMARH                          Benedetto - Cross

1   A.  I don't -- I don't follow what you're trying to ask me.

2   Q.  I'm sorry.  Did someone speak?

3   A.  I didn't follow what you're asking me.

4   Q.  Well, actually, the judge asked a question during your

5   direct testimony that I don't believe was actually answered.

6           You did not draft this document, did you?

7   A.  Which document are we talking about?

8   Q.  Exhibit B, which is --

9   A.  The declaration.

10  Q.  -- the declaration.

11  A.  The declaration?

12  Q.  Yes.

13  A.  When you're asking "draft," what do you mean by that?  Did

14  I write it down or did I speak to someone?

15  Q.  Well, it was not written on your computer, correct?

16  A.  I think that's privileged information.

17  Q.  You think it's what?

18  A.  I think that's privileged information by my attorneys.

19  Q.  I don't believe it is, but I'll let -- if there's an

20  objection, I'll let the Court resolve it.

21           But my question to you is was this document drafted on

22  your computer?

23  A.  No.

24  Q.  In fact, it was drafted on -- it was drafted by the

25  lawyers, correct?

JALHMARH                              Benedetto - Cross

1    A.  Yes.

2    Q.  It was drafted on their computer system, correct?

3    A.  I don't know if it was on their computer.  I wasn't there

4    when --

5    Q.  Can you please turn your attention to the bottom left-hand

6    corner of the document, and there is what I call a slug with

7    some numbers.  Do you see this?  The numbers read 6678834?

8    A.  Down at the bottom, yes.

9    Q.  That's a document inventory number of the

10   plaintiff's counsel, correct?

11   A.  I don't know that.

12   Q.  It's certainly not yours, correct?

13   A.  Not mine, no.

14   Q.  Now, in fact, the lawyers didn't just draft one version of

15   this declaration, did they?

16   A.  I don't know.

17   Q.  Well, they drafted four of them, didn't they?

18   A.  They might have.

19   Q.  Well, did you see all the versions?

20   A.  I might have.  I don't recall.

21   Q.  Do you see on the bottom left-hand corner the document

22   number refers to "V.4"?

23   A.  What page.

24   Q.  It's on every page?

25   A.  V.4, yes.

JALHMARH                          Benedetto - Cross

1  Q.  Does that, in fact, suggest there were four drafts of the

2  document?

3  A.  I don't know what that would mean.

4  Q.  Do you recall what might have been changed from a first

5  draft of the document?

6  A.  No.

7  Q.  Do you recall what might have been changed from a second

8  draft?

9  A.  No.

10  Q.  Do you recall what might have been changed from a third

11  draft?

12  A.  No.

13  Q.  Do you believe there were more than four drafts?

14  A.  I have no idea.  Might have been a typo.

15  Q.  Can you identify for the Court the name of the attorney who

16  created these drafts for you to review?

17  A.  I believe it was Joseph Gallo.

18  Q.  At that time did you understand that Mr. Gallo was your

19  personal lawyer?

20  A.  Yes.

21  Q.  When did he become your lawyer?

22  A.  Right after the service was done.

23  Q.  Why did you believe it was necessary to have a lawyer?

24  A.  Because it was being challenged.

25  Q.  Did Mr. Gallo assist you with preparing for your testimony

JALHMARH                          Benedetto - Cross

```
 1   today?
 2   A.  No.
 3   Q.  You didn't meet with him?
 4   A.  I'm sorry?
 5   Q.  You did not meet with him?
 6   A.  Yeah, I met with him.
 7   Q.  When did you meet with him?
 8   A.  I believe sometime last week.
 9   Q.  I see.  At that meeting, the subject of this hearing did
10   not come up?
11   A.  That's privileged information what we spoke about.
12            MR. GALLO:  I mean, the --
13            MR. BAUM:  I believe the point's made.  I'll move on.
14            THE COURT:  I think so.  I assume she's not -- you
15   don't really represent her?
16            MR. GALLO:  We represent her -- I'm sorry, your Honor.
17   We represent her in connection with this hearing.  We
18   believe --
19            THE COURT:  You represent both the witness and the
20   party?
21            MR. GALLO:  Yes, your Honor.
22            THE COURT:  All right.
23            MR. BAUM:  Your Honor, we have problems with this, but
24   we can move on.
25            THE COURT:  All right.  Please proceed, yes.
```

JALHMARH                          Benedetto - Cross

1    BY MR. BAUM:

2    Q.  I'd like now to turn our attention specifically to some

3    more of the testimony that's written in the declaration.

4              According to your version of the events, you arrived

5    at the venue at around 7:00 p.m., correct?

6    A.  That's correct.

7    Q.  And you sat on a stoop of a restaurant outside of the tour

8    bus at 7:45 p.m., correct?

9    A.  It might have been that time, correct.

10   Q.  When you say "it might have been that time," are you

11   certain that it was that time?

12   A.  I'm certain.

13   Q.  What was the name of this restaurant?

14   A.  I don't know the name.  It was the side of a restaurant.

15   It was the kitchen door.

16   Q.  And you remember that you were sitting in front of two tour

17   buses, right?

18   A.  Correct.

19   Q.  Actually, I think there may have been a reference to

20   another bus.  Were there more buses on the street?

21   A.  There were two buses back to back.

22   Q.  Back to back?

23   A.  Right, yes, back to back.  I have a photo of it.

24   Q.  You do?

25   A.  Yes.

JALHMARH                              Benedetto - Cross

1    Q.   They were actually very large buses, correct?

2    A.   Yes.

3    Q.   I was having trouble following earlier.  Were they actually

4    the size of commercial airliners?  Is that what was said?

5    A.   I'm sorry?

6    Q.   How big were they?

7    A.   About the size of a Greyhound bus, even a little bigger.

8    Q.   OK.

9    A.   You're talking about lengthwise?

10   Q.   Lengthwise or just size, volume.

11   A.   Like a Greyhound bus.

12   Q.   Now, the engine of the buses were running, correct?

13   A.   Yes.

14   Q.   All of them?

15   A.   Yes.

16   Q.   You knew that because they were making noise, right?

17   A.   Yes, and I saw the water on the ground.

18   Q.   Huh?

19   A.   The water from the air conditioner would be on the ground.

20   Q.   But you also heard the noise?

21   A.   Yes.

22   Q.   Rather loud, right?

23   A.   Not that loud, no.

24   Q.   Now, Mr. Beck exited his bus at approximately 8:22

25   according to your version of events, correct?

JALHMARH                              Benedetto - Cross

1   A.   Yes.

2   Q.   And you remained seated on the stoop until he started --

3   until he turned and started to walk toward the venue, right?

4   A.   No, as soon as the bus door opened.

5   Q.   As soon as the bus door opened what?

6   A.   Him walking down the steps from the bus.

7   Q.   So as he was walking down the steps from the bus --

8   A.   Right.

9   Q.   -- you stood up?

10  A.   Correct.

11  Q.   So this is before he passed you?

12  A.   Yes.

13  Q.   And this is before he started walking to the venue?

14  A.   Yes.

15  Q.   So he was not already passing you at the time that you were

16  confirming who he was?

17          Let me clarify.  You stood up and yelled to Mr. Beck

18  before he started walking towards the venue, is that correct?

19  A.   Yes, that's correct.

20  Q.   And you're certain about that testimony?

21  A.   Yes, definitely.

22  Q.   So if I said to you that you actually waited until he

23  started walking towards the venue --

24  A.   No, not at all.

25  Q.   Not at all?

JALHMARH                          Benedetto - Cross

```
 1    A.  No.

 2    Q.  Not even close?

 3    A.  No.

 4    Q.  Nobody could say that accurately?

 5    A.  That's correct.

 6    Q.  Could you please turn to paragraph 10 of your declaration.

 7            I'd like to call your attention, in particular, to the

 8    last two sentences of the paragraph which read:  "Defendant" --

 9    that's Mr. Beck, correct?  Sorry.  I should have said I'll ask

10    a question.

11    A.  Would you say again.

12    Q.  When you refer to defendant in this document, you're

13    referring to Mr. Beck?

14    A.  Yes.

15    Q.  It says, "Defendant began walking towards the concert venue

16    with three other men, some or all of whom appeared to me to be

17    security guards."

18            Do you see that?

19    A.  Yes.

20    Q.  OK.  "As Beck and the men he was with walked towards the

21    venue, I stood up and walked towards Beck."

22            Do you see that?

23    A.  Yes.

24    Q.  Which is accurate, your testimony on the stand today or the

25    testimony that you wrote in your declaration?
```

JALHMARH                         Benedetto - Cross

1    A.  Well, it's kind of misleading.  Let me just look at this,
2    please.
3    Q.  Which part is misleading?
4    A.  The part that as soon as he exited the bus, when the bus
5    door opened.
6    Q.  I see.
7    A.  As soon as I saw him coming down the steps, I was on the
8    stoop.  I stood up.  He was coming down.  We were face to face.
9    Q.  I see.  In the declaration you don't write that you were
10   face to face, do you?
11   A.  I don't believe so.
12   Q.  And in the return of service that you signed that's been
13   marked as Beck Exhibit A, you also don't refer to being face to
14   face with Mr. Beck, do you?
15   A.  Well, I was face to face with him.
16   Q.  That was not my question.
17           You had an opportunity to say that in the return of
18   service, and you chose not to, correct?
19   A.  I might have overlooked it.
20   Q.  I see.  So the answer is correct, you didn't mention it?
21   A.  I didn't mention it.
22   Q.  You also didn't mention it in your declaration, correct?
23   A.  Probably so.
24   Q.  You didn't mention it in version one, version two, version
25   three, or version four of your declaration, correct?

JALHMARH                          Benedetto - Cross

1   A.  Yes, because it was happening in 2018, so I was trying to

2   remember as best as I could.

3   Q.  I understand.

4   A.  But some of these things stay vividly in my mind.

5   Q.  Do you think your recollection has changed over time as to

6   what happened?

7   A.  Somewhat, but not as to that recollection.

8   Q.  I'm sorry?

9   A.  That recollection is correct.

10  Q.  Which recollection is correct, the recollection in the

11  return of service or in the declaration or your recollection

12  today?

13  A.  That I saw him face to face.  And I know that because I was

14  on the phone with Gail, and I mentioned that to her.

15  Q.  I see.  So the return of service was drafted, you said, on

16  August 16 of 2018, correct?

17  A.  I don't recall that date.

18  Q.  Well, that's the date of the document that's -- or at least

19  there was some confusion about that, but the declaration was

20  signed in November of 2018, correct?

21  A.  Yes, it's possible, yes.

22  Q.  OK.  We are now in October of 2019, correct?

23  A.  Right.

24  Q.  So do you believe your recollection of the events is better

25  today, one year later, than it was in November of 2018 when you

JALHMARH                          Benedetto - Cross

 1  drafted the document or when the document was drafted for you?
 2  A.  It's the same, remains the same.
 3  Q.  The memory is the same?
 4  A.  That's correct.
 5  Q.  But the versions differ, correct?
 6  A.  It might have -- it might have maybe left something out,
 7  but I know it to be true because from the time that I arrived
 8  there, from the time I left, I was constantly on the phone with
 9  Gail telling -- she heard me yelling, number one.
10  Q.  Did you have a photograph of Mr. Beck with you to compare
11  to his face?
12  A.  I didn't need one.
13  Q.  Now, you didn't yell to Mr. Beck until he was already
14  walking towards the venue, is that correct?
15  A.  That's not correct.
16  Q.  That's not correct?
17  A.  No.
18  Q.  So your testimony today is that you yelled at him when he
19  was face to face with you?
20  A.  When he -- yes, as soon as he stepped down on the curb --
21  Q.  So you yelled --
22  A.  -- that's when I was yelling at him.
23  Q.  So you yelled to him before he started walking to the stage
24  door of the venue?
25  A.  Definitely.

JALHMARH                          Benedetto - Cross

1    Q.  Did you say "definitely"?

2    A.  Definitely, yes.

3    Q.  You're absolutely certain about that?

4    A.  Yes.

5    Q.  There's no way it could be the other way around?

6    A.  No.

7    Q.  So you wouldn't have written that it occurred any other

8    way?

9    A.  It might have been interpreted a different way.  What

10   are -- I don't understand what you're saying.

11   Q.  Can you please turn to paragraph 11 --

12   A.  I was on --

13   Q.  -- of your declaration.  The first sentence of that

14   statement says:  "As defendant was walking toward the venue,

15   when I was approximately five feet behind defendant, I yelled

16   clearly and loudly to defendant that I was a process server and

17   that I was there to serve a summons on Jeff Beck. "

18   A.  But that was the second time.

19   Q.  This was the second time that you started yelling at him?

20   A.  That's correct.

21   Q.  I see.  Can you please identify for the Court in your

22   declaration where the supposed first yelling occurred?

23   A.  I believe in paragraph -- wait a minute.  Ten -- let's see.

24   It might have not been mentioned there.

25   Q.  I see.  Now, in fact, you didn't say anything until you

JALHMARH                          Benedetto - Cross

1    were already behind one of the security guards, right?

2    A.   That's not correct.

3    Q.   That's not correct?

4    A.   No.

5    Q.   Can't be correct?

6    A.   No.

7    Q.   Can you please turn to Exhibit A, the return of service.

8         Am I correct that in the third sentence you write:  "I

9    was behind the guard, right behind Mr. Beck.  I called out to

10   Mr. Beck explaining that I was a process server, that I was

11   there to serve in a summons and complaint."

12        This document was signed by you, correct?

13   A.   Yes.

14   Q.   Now, am I correct that during the entire duration of your

15   walk from the bus to the stage door, Mr. Beck never turned

16   around to look at you?

17   A.   No.

18   Q.   He never said anything to you, correct?

19   A.   No.

20   Q.   He never asked why you were there, did he?

21   A.   No.

22   Q.   He never told you to go away, did he?  He never reached for

23   the papers with his hands?

24   A.   No.

25   Q.   He never pushed the papers out of your hands?

JALHMARH                              Benedetto - Cross

1   A.  No.

2   Q.  He just kept on walking his way to the stage door, correct?

3   A.  That's correct.

4   Q.  And during the entirety of the walk, the buses were, in

5   fact, running the entire time, right?

6   A.  Yes.

7   Q.  OK.  Do you know who Mr. Christian Fenn is?

8   A.  No.

9   Q.  Do you recognize him -- I'd like to avoid showing you the

10  videos again, just to save time, but I'm happy to do so if you

11  wish.

12          You recall that there were three men walking?

13  A.  Yes.

14  Q.  Am I correct that -- and you referred to one of the

15  security guards that turned around for a fleet second, right?

16  A.  Yes.

17  Q.  The other two individuals, neither of them ever turned

18  around to you, correct?

19  A.  Not to my knowledge, no, no, just --

20  Q.  None of them ever said anything to you?

21  A.  No.

22  Q.  Now, the security guard that did turn around, would you

23  agree with me he turned around, if at all, for about a second?

24  A.  Probably so.

25  Q.  He didn't say anything to you, did he?

JALHMARH                        Benedetto - Cross

1   A.  No.

2   Q.  He didn't push you away, did he?

3   A.  No.

4   Q.  He didn't knock the papers out of your hand, did he?

5   A.  No.

6   Q.  So looking at the video, it's reasonable to believe that

7   Mr. Beck had no idea who you were, correct?

8   A.  I don't know.  He never turned around.

9   Q.  Now I'd like to talk a little bit about this yelling that

10  occurred.

11          According to you -- well, did you yell at Mr. Beck for

12  the entirety of the walk?

13  A.  Yes, about 15 times.

14  Q.  Fifteen times?

15  A.  About.

16  Q.  Starting from the moment he exited the bus?

17  A.  He left the bus, yes.

18  Q.  To the moment --

19  A.  Yes.

20  Q.  -- that he entered the stage door?

21  A.  That's correct.

22  Q.  I actually would like to play the video for you, the first

23  video.  And if you may, please identify by alerting any of us

24  at any time that you see yourself yelling.  OK?

25  A.  You're not showing the whole video, though.

JALHMARH                          Benedetto - Cross

1    Q.  Well, you can see your face in the video, right?

2    A.  But you're forgetting about the time that he got off the

3    bus.  That whole section, that's like half -- half of the

4    video.

5    Q.  OK.

6    A.  It's not accurate.

7    Q.  Well, we're going to talk about that.

8           So you testified earlier that the video captures about

9    half of the walk, right?

10   A.  Right.

11   Q.  So when they played the video, I actually was counting a

12   bit with my fingers, and I spotted from the moment that you

13   appeared till the entrance of the stage door was approximately

14   30 seconds.

15   A.  That's halfway there.

16   Q.  I understand.

17   A.  That's halfway --

18   Q.  So you believe the entirety of the walk took about a

19   minute?

20   A.  No, no.

21   Q.  What is 30 seconds times two?

22   A.  What?

23   Q.  It's a minute?

24   A.  Say that again.

25   Q.  How long did it take for you to walk from the stoop to the

JALHMARH                          Benedetto - Cross

```
 1  stage door?  About a minute, correct?
 2  A.  No, more than that.
 3  Q.  More than that?
 4  A.  Yes.
 5  Q.  How much more?
 6  A.  Lengthwise from Westchester and Broad, where the corner
 7  where the bus was --
 8  Q.  Yeah.
 9  A.  -- up until the part of the stage door, it was pretty
10  lengthy.  I would say a good maybe three or four minutes.
11  Q.  Ms. Benedetto, is it your testimony that you were walking
12  for three to four minutes?
13  A.  It could have been.
14  Q.  You believe that the tour bus was parked a three- to
15  four-minute walk from the stage door?
16  A.  The bus was parked far from the stage door, yes.
17  Q.  It was a three- to four-minute walk?
18  A.  Maybe two minutes.
19  Q.  I see.  Now it's two minutes?
20  A.  Yeah.
21  Q.  We're getting closer.
22  A.  I'm trying to figure out the length and everything, how
23  long it took.
24  Q.  Earlier you said the video captured approximately half of
25  the walk, right?
```

JALHMARH                          Benedetto - Cross

1    A.   Yes.

2    Q.   But if it actually took two minutes, it would take a

3    quarter of the walk?

4         I'm just trying to understand which part of your

5    testimony is accurate, so I'd like you to be clear for us.

6    A.   The accuracy starts from the time he got off the bus coming

7    down those steps when I stood up, yelled out his name, "Jeff

8    Beck, my name is Linda Benedetto.  I'm a process server.  I'm

9    here to serve you a summons and complaint," stepped down onto

10   the sidewalk, turns, security guard is right in back of him.  I

11   did not know -- I had to protect myself.  I wasn't going to get

12   any closer than the length that you're showing in the video.  I

13   was behind him.  From that time on, I started yelling the same

14   thing that I just yelled out prior to this, before, when I

15   first got on the stand.  That lasted all the way up until the

16   time that I reached the stage door.  And the reason why I know

17   that is because my boss was on the phone.

18   Q.   I see.

19   A.   Yes.

20   Q.   The boss was on the phone?

21   A.   Continuously.

22   Q.   And you had a cell phone with you?

23   A.   Yes.

24   Q.   Which hand was the cell phone in?

25   A.   In my left.

JALHMARH                          Benedetto - Cross

1    Q.  In your left hand?

2    A.  That's correct.  There were points in time that we did hang

3    up and get back on, like maybe a minute or two, something like

4    that.

5    Q.  So at some points during the walk, you lifted the cell

6    phone to your head and other times you didn't?

7    A.  Yes.

8    Q.  Did you talk on the cell phone at any time when you were --

9    like, let's say, the last 30 seconds of the walk, did you pick

10   up the cell phone at all?

11   A.  At that point, no, no.

12   Q.  So how did you go from holding a cell phone to holding a

13   bag, back and forth, with only one hand?

14   A.  It was around the clutch of the bag.

15   Q.  So you were holding --

16   A.  Yes, yes.

17   Q.  Well, I'd like to start with what you'd said earlier.

18   A.  The cord was in my arm right there, and the cell phone was

19   in my hand.

20   Q.  It would slip down and slip up?

21   A.  It didn't slip down because I had it up.

22   Q.  In the video you're holding it down, correct?

23   A.  At that point, yes.

24   Q.  Now, earlier you had said that the video captures about

25   half of the walk?

JALHMARH                          Benedetto - Cross

1    A.   Yes.

2    Q.   That's how you remember it now?

3    A.   Uh-huh.

4    Q.   Now, the judge asked you whether you saw, watching the

5    video, you yelling at any time.  And you were unable to

6    identify, based on the video, any moving of your face to

7    indicate yelling, is that right?

8    A.   Right.

9    Q.   Sitting here today, you can't identify on the video at what

10   point you were yelling?

11   A.   Which video are we talking about?  Which one?

12   Q.   The first two videos are just different angles of the same

13   walk, so let's go with the first video.

14           The first video, do you see -- you testified that you

15   didn't see yourself yelling, correct?

16   A.   I might have -- probably.  I might have stopped for a

17   minute.

18   Q.   You might have stopped for a minute?

19   A.   Yeah.

20   Q.   OK.  Of course --

21   A.   I might have stopped for a minute yelling.

22   Q.   Pardon?

23   A.   I might have stopped for a minute yelling to catch my

24   breath.

25   Q.   Then you started again?

JALHMARH                          Benedetto - Cross

1   A.  Continuously.

2   Q.  Why would you need to catch your breath?

3   A.  We were walking fast.

4   Q.  I see.  Actually, I'd like to hear everything that you said

5   when you were yelling.  You don't have to yell it, but if you

6   can just say -- so we can sort of count how long, can you say

7   everything you were saying.

8   A.  "Jeff Beck, my name is Linda Benedetto.  I'm a process

9   server.  I'm here to serve you a summons and complaint."

10  Q.  OK.  Just based on my amateurish snapping of my fingers,

11  that took between 10 and 12 seconds to say.  Would you agree

12  with me?

13  A.  Yes, if that's what you say, OK.

14  Q.  Do you believe it took any less than 10 to 12 seconds to

15  say that?

16          MR. GALLO:  Objection, your Honor.  I'm not sure the

17  snapping of the fingers is a sufficient way to figure out the

18  amount of time it took for her to say that.

19          MR. BAUM:  No problem.  I'm happy to time it.

20          THE COURT:  All right.

21          MR. GALLO:  Thank you.

22          MR. BAUM:  Actually, they took my cell phone from me,

23  but I believe my watch can probably do it.

24  BY MR. BAUM:

25  Q.  OK.  Can you please repeat all that when I say "Go."

JALHMARH                          Benedetto - Cross

1    Ready, set, go.

2    A.   "Jeff Beck, my name is Linda Benedetto.  I'm a process

3    server.  I'm here to serve you with summons and complaint."

4    Q.   OK.  So my apologies.  My watch indicates seven seconds.

5          So if the video, which is 30 seconds approximately, is

6    half of the walk, the walk would then be a minute.  It took you

7    seven seconds.  Do you believe that you could have said

8    something that was seven seconds ten times in a minute?

9    A.   Yes -- in a minute?  Well, I didn't say it was every

10   minute.  I don't know what you're saying.

11   Q.   How many times did you yell it?

12   A.   About 15 times.

13   Q.   Fifteen times?

14   A.   Yeah.

15   Q.   So if you yelled it 15 times, if you didn't even take a

16   breath, that would take about a minute and a half, right?

17   A.   And?

18   Q.   Well, am I correct?

19   A.   It would take a minute and a half for me to say everything

20   I just said?

21   Q.   If you said something 15 times that took you seven seconds

22   to say, it would -- if you didn't even take a breath, it would

23   take more than a minute and a half, right?

24   A.   Right.

25   Q.   OK.  The video is 30 seconds, and you said it's

JALHMARH                        Benedetto - Cross

1    approximately half of the walk.  So that's a minute?

2    A.  Yes, yes.

3    Q.  So it's actually not physically possible to say what you

4    just said 15 times during that entire walk, correct?

5    A.  No, you're wrong.

6    Q.  I'm wrong?

7    A.  Yes.

8    Q.  What part of my math is wrong?

9    A.  I never stopped.

10   Q.  You never stopped?

11   A.  Maybe once to catch my breath when they started walking

12   real fast.

13   Q.  I see.  So if you started to --

14   A.  The moment that we left the bus, they were not walking that

15   fast.

16   Q.  Well, if you stopped to take a breath, that would only add

17   to the amount of time that it would require you to say it.

18   A.  No, I started taking a breath going closer to the door,

19   because they were walking real fast at that point in time.

20   Q.  I see.  So it's your testimony that you were -- you said it

21   15 times in, I guess, less than 30 seconds, and then just

22   stopped for the next 30 seconds completely?

23   A.  No.

24   Q.  Well, I can play you the video.  Maybe it's helpful if you

25   can just identify when you had to stop to take a breath from

JALHMARH                          Benedetto - Cross

1    these 15 times you were saying it.

2    A.   Probably closer to the stage door.

3    Q.   Probably close to the stage door?

4    A.   There might have been maybe another time also.  It was a

5    lengthy walk.

6    Q.   So you were taking a lengthy walk?

7    A.   Yes.

8    Q.   You were yelling something that was seven seconds long?

9    A.   Right.

10   Q.   For 15 times?

11   A.   Yes.

12   Q.   And you did that, by the way, without breaking a gait in

13   your step, is that right?

14   A.   Without -- sometimes my steps changed.

15   Q.   OK.  Can we just take another look at the video, please.

16   A.   You're looking at half of the video, though.

17   Q.   I understand.  But looking at half the video, I would like

18   to see when you stopped to take a breath from saying this 15

19   times.

20   A.   I don't remember that.

21   Q.   I understand you don't remember it, but --

22   A.   When I stopped --

23   Q.   I would like to point out to the video you can't even

24   identify it, can you?

25   A.   Identify what?

JALHMARH                           Benedetto - Cross

1   Q.  When you stopped to take a breath.

2   A.  Why would I even concern myself with what I -- when I would

3   do something like that?  My job -- I don't understand why I

4   would concern myself as to mark down when I took a breath.

5   There was no stopping.  It was just like a pause.

6   Q.  But there's no doubt in your mind that you said this 15

7   times?

8   A.  Definitely.

9   Q.  It's not possible that you only said it maybe ten times?

10  A.  No.  If you saw from where the bus was parked up until the

11  stage door, you would say there's probably room for more.

12  Q.  Probably room for more?

13  A.  Uh-huh.

14  Q.  You yelled at him once when he got out of the bus, right?

15  A.  All the way up to the point of the door.

16  Q.  And is it possible that you only yelled at him only ten

17  times when you were walking from the bus to the door?

18  A.  I'd say 15.

19  Q.  Can you please turn to paragraph 14 of your declaration.

20  The first sentence reads:  "During that walk, I announced

21  approximately ten additional times that I was a process

22  server and that I was there to serve legal documents on Jeff

23  Beck."

24          Do you see that statement?

25  A.  Approximately, I said.

JALHMARH                              Benedetto - Cross

1  Q.  I see.  In your mind, approximately ten times means
2  actually more than 15 times?
3  A.  Right.
4  Q.  OK.  I think we've covered all of this, but now at the time
5  that you were walking from the bus to the stage door, you were
6  basically just walking behind the group, correct?
7  A.  Yes.
8  Q.  You didn't start running at any time, did you?
9  A.  No.
10  Q.  You didn't try and get around the security guard, correct?
11  A.  No, I would never do that.  I mentioned that to you before.
12  Q.  I didn't hear that answer.
13  A.  I mentioned that to you before --
14  Q.  Nobody --
15  A.  -- that I didn't want to get close.
16  Q.  You didn't want to get close.
17        Now, is it possible that you could have done something
18  more to catch up to Mr. Beck?
19  A.  I didn't want to do that, no.  I -- for my safety, I would
20  not run into two big men that were in front of him, knowing
21  they're security guards.  For my protection, this is how I
22  serve.
23        MR. BAUM:  Your Honor, I have no further questions.
24        THE COURT:  All right.  Any redirect?
25        MR. GALLO:  Just very briefly, your Honor.

JALHMARH                        Benedetto - Redirect

 1              THE COURT:  Sure.

 2              MR. GALLO:  Thank you.

 3  REDIRECT EXAMINATION

 4  BY MR. GALLO:

 5  Q.  Ms. Benedetto, you said during cross-examination that you

 6  were walking behind Mr. Beck and the other men walking with

 7  him, and at some point they increased their speed.  Is that

 8  correct?

 9  A.  Yes.

10  Q.  Do you have any idea why?

11  A.  Just to get away from me, I would assume.

12  Q.  In your declaration -- there was a discussion on

13  cross-examination about your throwing the papers at Mr. Beck?

14  A.  Yes.

15  Q.  Can you look at page 4 of your declaration.  Let me know

16  when you're there, please.

17  A.  Yes.

18  Q.  Can you look at the bottom.  Is that your signature?

19  A.  Yes.

20  Q.  Did you review this document before you signed it?

21  A.  Yes.

22  Q.  Can you look at paragraph 20 at the top of the page.

23  A.  Yeah, you want me -- yes.

24  Q.  Can you read that, please, for the Court.

25  A.  OK.  "A different video shows that I threw the summons and

JALHMARH                        Benedetto - Redirect

1    complaint into the venue door approximately two or three

2    seconds after defendant entered the door.  The summons and

3    complaint appears to have landed between the legs of the

4    security guard standing in the doorway, approximately five feet

5    behind Beck.  It was at that time I yelled to Beck that he had

6    been drop served."

7    Q.  Is that consistent with your recollection today?

8    A.  Yes.

9            MR. GALLO:  Thank you, your Honor.  I have no more

10    questions.

11            THE COURT:  All right.  Anything else?

12            You can step down.  Thank you so much.

13            THE WITNESS:  Should I leave these here?

14            THE COURT:  Yes.

15            (Witness excused)

16            (Discussion held off the record)

17            THE COURT:  I know it's been a long morning.  Does

18    anyone want to make any final remarks?  Do you want to take a

19    break and do that?  Is that not necessary?  I'm fairly familiar

20    with the issues and it's a pretty discrete issue, but I leave

21    it to you.

22            MR. BAUM:  We don't believe it's necessary, your

23    Honor, that being Mr. Baum for Mr. Beck.

24            THE COURT:  And plaintiff's position?

25            MR. NICYPER:  From plaintiffs, no, I think her

JALHMARH                        Decision

1    testimony is quite clear about her yelling.

2              THE COURT:  All right.  Thank you.

3              Why don't we take a break for a little while, come

4    back in, say, 15 minutes, and then I'll see if I have any

5    remaining issues.  All right.  Thank you.

6              (Recess)

7              THE COURT:  Thank you all for your patience.

8              I've reviewed the parties' submissions, including the

9    memorandum of law, the supporting declarations, surveillance

10   videos, and I've considered the testimony today.  I'm ready to

11   rule.  I'm just going to do so orally now.  You'll have the

12   transcript, but I think it's more efficient this way.

13             For the reasons I'll now explain, I'm granting

14   Mr. Beck's motion to dismiss for failure to effective personal

15   service and lack of personal jurisdiction.

16             A motion to dismiss must be granted when a court lacks

17   personal jurisdiction over a defendant.  *See, e.g., John Wiley*

18   *& Sons*, 2009 WL 1766003, at 3.

19             Prior to discovery, a plaintiff challenged by a

20   jurisdiction testing motion may defeat the motion by pleading

21   in good faith, legally sufficient allegations of jurisdiction.

22   At that preliminary stage, the plaintiff's *prima facie* showing

23   may be established solely by allegations.  *Dorchester Financial*

24   *Services*, 722 F.3d 84 -- excuse me, at 84-85.

25             When the defendant contests the plaintiff's factual

JALHMARH                              Decision

1    allegations, as Mr. Beck does here, then a hearing is required,

2    at which the plaintiff must prove the existence of jurisdiction

3    by a preponderance of the evidence.  *Id.* at 85.

4           Federal Rule of Civil Procedure 4(e)(2) specifically

5    authorizes personal service of a summons and complaint upon an

6    individual physically present within a judicial district of the

7    United States, and such personal service comports with the

8    requirements of due process for the assertion of personal

9    jurisdiction.  *Kadic v. Karadzic*, 70 F.3d at 247.

10          In New York, CPLR 308(1) provides that personal

11   service upon a natural person shall be made by delivering the

12   summons within the state within the person to be served.  Such

13   service must be clear and unequivocal so that a reasonable

14   defendant knows he or she has been served with process.  *Weiss*

15   *v. Glemp*, 972 F.Supp at 224.

16          New York courts have interpreted the delivery

17   requirement of Section 308 strictly.  *Id.* at 224.

18   Consequently, the requirement that the summons and complaint be

19   delivered to the person to be served has been applied in

20   accordance with its plain and literal language.  *Dorfman v.*

21   *Leidner*, 76 N.Y.2d at 957.

22          That said, where defendants actively resist, New York

23   courts have allowed some flexibility in the actual delivery of

24   service under the subsections of CPLR Section 308.  *Ingenito v.*

25   *Riri USA*, 2011 WL 4056078, at *4.

JALHMARH                              Decision

1          Specifically, where the person to be served is himself

2    clearly attempting to resist or evade service, the summons may

3    be left in close proximity of the person to be served or near

4    the door which the person to be served refused to open.  The

5    *Haddad* case, 183 Misc.2d at 832.  Under CPLR 308(1), delivery

6    of a summons and complaint may be accomplished by leaving it in

7    the general vicinity of the person who resists service.  *Melkaz*

8    *International*, 176 F.R.D. 642 note 6.

9          In this case, plaintiff has failed to meet his burden

10   of proving by a preponderance of the evidence that process was

11   sufficient.  This Court thus lacks personal jurisdiction over

12   Mr. Beck.

13         First, plaintiff has failed to prove that service was

14   clear and unequivocal so that a reasonable defendant would know

15   that he had been served with process.  *Weiss v. Glemp* at 224.

16         Based on the surveillance video and the testimony we

17   just heard, plaintiff has failed to prove that Mr. Beck was

18   aware that he was being served.

19         On the video, Mr. Beck did not appear to flinch, turn

20   around -- on the videos, I should say.  And I'm just focusing

21   on the two.  I don't think I need to rely on the third to which

22   there was an objection.

23         On the videos, Mr. Beck did not appear to flinch, turn

24   around, respond, gesture to his colleagues, slow down, or speed

25   up his pace, thereby suggesting that he did not hear

JALHMARH                         Decision

1   Ms. Benedetto.  She was, furthermore, numerous feet behind him

2   at all times with two individuals between them.

3          Ms. Benedetto testified today that when Mr. Beck got

4   off the bus, she was face to face with and made eye contact

5   with him when she first advised him she was serving him.  There

6   is no video of this interaction, and this account is

7   inconsistent with Ms. Benedetto's prior accounts in her

8   declaration and return of service, which indicate that she was

9   behind rather than facing Mr. Beck when she called or yelled

10  out to him.

11         Ms. Benedetto also testified today that she yelled to

12  Mr. Beck that she was a process server at least 15 times, but

13  nowhere on the video do I see her appear to be yelling.

14  There's also some inconsistency between Ms. Benedetto's

15  testimony about how close she was to Mr. Beck and her statement

16  about that distance in her declaration.

17         Mr. Beck's testimony, by contrast, was consistent with

18  the statements he made in his declaration, as well as those

19  made by Christian Fenn.

20         To be clear, I don't doubt that at some point

21  Ms. Benedetto did state that she was a process server there to

22  serve Mr. Beck, possibly numerous times, but it just hasn't

23  been proven that he actually heard her, particularly given the

24  distance between them and over the noise of the buses.

25         Therefore, because plaintiff has failed to prove by a

JALHMARH                              Decision

1   preponderance of the evidence that Mr. Beck was even aware of

2   Ms. Benedetto's attempts to serve him, plaintiff necessarily

3   failed to prove that Mr. Beck was actively resisting service.

4   *Ingenito* at page 4.

5           I thus need not reach the question of whether

6   Ms. Benedetto's attempt to throw the summons and complaint

7   through the stage door after Mr. Beck walked through was

8   sufficient to show that she left it in his general vicinity.

9   *Melkaz* at 642, note 6.

10          Because plaintiff has failed to prove the existence of

11  jurisdiction by a preponderance of the evidence, I'm granting

12  Mr. Beck's motion to dismiss the complaint for lack of personal

13  jurisdiction.

14          So that's my ruling.  Thank you all for your advocacy

15  here today and in your papers.  Are there any other

16  applications at this time?

17          MR. NICYPER:  Not at this time, your Honor.

18          THE COURT:  Thank you.  Have a good day.

19          (Adjourned)

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    GEOFFREY ARNOLD BECK

4    Direct Examination by Mr. Baum ............... 5

5    Cross-Examination by Mr. Nicyper ............. 16

6    Redirect Examination by Mr. Baum ............. 36

7    Recross Examination By Mr. Nicyper............ 38

8

9    LINDA BENEDETTO

10   Direct Examination by Mr. Gallo .............. 40

11   Cross-Examination by Mr. Baum ................ 61

12   Redirect Examination by Mr. Gallo ............ 107

13

14

15

16

17

18

19

20

21

22

23

24

25